**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HANK DRAGER and THOMAS LE, on behalf of themselves and all others similarly situated, | ) ) ) | **CLASS ACTION** |
| Plaintiffs, | ) ) | Case No.:  1:09-cv-6481 |
| vs. | ) ) | Judge Hart |
| BROADWAY SUPERMARKET, an Illinois corporation, | ) ) ) | Magistrate Judge Brown |
| Defendant. | ) | |

**PLAINTIFFS' MOTION AND INCORPORATED**
**MEMORANDUM IN SUPPORT OF CLASS CERTIFICTION**

Plaintiffs Hank Drager and Thomas Le ("plaintiffs") respectfully request that the Court

enter an order certifying this case to proceed as a class action as to the following class of

persons:

> **all persons to whom the Defendant provided an electronically printed receipt at the**
> **point of sale or transaction, in a transaction occurring in Illinois after June 4, 2008,**
> **which receipt displays either (a) more than the last five digits of the person's credit**
> **card or debit card number, or (b) the expiration date of the person's credit or debit**
> **card, or (c) both.**

Plaintiffs also request that the Court enter an order appointing Hank Drager and Thomas Le as

class representatives, and Burke Law Offices, LLC and KMD Law Office as class counsel. In

support of this motion, plaintiffs state:

**I.      PURPOSE OF A CLASS ACTION**

The purpose of a class action is to promote judicial economy by avoiding duplicative

suits against the same defendant, and to protect the rights of persons who may not be able to

assert their claims on an individual basis.  *Crown, Cork, & Seal Co. v. Parking*, 462 U.S. 345

(1983).  As the United States Supreme Court has observed, "[c]lass actions serve an important

function in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981). "Class

actions … permit the plaintiffs to pool claims which would be uneconomical to litigate

individually. [M]ost of the plaintiffs would have no realistic day in court if a class action were

not available." *Phillips Petroleum v. Shutts*, 472 U.S. 797, 808-809 (1985); *see also Mace v. Van*

*Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1977) (class actions aggregate "relatively paltry

potential recoveries into something worth someone's (usually an attorney's) labor.").

## II.    NATURE OF THE CASE

This case was brought pursuant to the Fair and Accurate Credit Transactions Act,

"FACTA" amendment to the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq.  FACTA was

passed in 2003 in an effort to curb rampant identity theft and credit card fraud.  The provision

of FACTA upon which this case is brought, 15 U.S.C. §1681c(g) provides that that "no person

that accepts credit cards or debit cards for the transaction of business shall print more than the

last 5 digits of the card number or the expiration date upon any receipt provided to the

cardholder at the point of sale or transaction."

Defendant provided both plaintiffs and thousands of other persons at the point of sales

or transaction with printed receipts that showed the expiration date on them.  Plaintiff alleges

that the violation herein was "willful" pursuant to the FCRA; that is to say that defendant acted

with reckless disregard to the rights of others.  *Safeco Ins. Co. of Am. v. Burr***,** 551 U.S. 47 (2007)

*Miller-Huggins v. Mario's Butcher Shop, Inc.,* 2010 WL 658863 (N.D.Ill. Feb. 22, 2010) (Hart, J.)

(certifying FACTA class).

It is clear that noncompliant receipts were provided:  defendant has admitted that it

printed the expiration date on each electronically printed receipt it created during the class

period. The only issue for resolution is whether these violations were "willful" or not – a

determination that rests upon the defendant's conduct, which will be applicable for each class

member the same as for plaintiffs.

The Seventh Circuit has held that cases such as the one before this Court should be

resolved on a class-wide basis. It specifically found that,

> to decide whether [a defendant] has adhered to the statute [the Fair Credit Reporting
> Act], a court need only determine whether the four corners of the offer satisfy the
> statutory definition (as elaborated in [*Cole v. U.S. Capital, Inc.,* 389 F.3d 719 (7th Cir.
> 2004)]).... ***These questions readily may be resolved for a class as a whole***. [*Murray v.
> GMAC Mortgage Corp.*, 434 F.3d 948, 956 (7th Cir. 2006) (emphasis added).]

Since *GMAC Mortgage*, District Judges have followed the Seventh Circuit's holdings in

numerous cases. For example, in a case with a similar fact pattern, the Court found that the

class action procedure was superior to all other resolution methods, holding that,

> a class action is a superior method of adjudication when "economies of time, effort, and
> expense" are achieved "without sacrificing procedural fairness." [*Amchem Prods. v.
> Windsor*, 521 U.S. 591, 614 (1997).] Additionally, a class action is an appropriate and
> superior means of adjudication when the potential recovery on a claim is "too slight to
> support individual suits, but injury is substantial in the aggregate." [*GMAC Mortgage* ],
> 434 F.3d at 953 (citing *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344-345 (7th Cir.
> 1997)). Such is the case here. [*Claffey v. River Oaks Hyundai, Inc.*, 238 F.R.D. 464, 468
> (N.D.Ill. 2006).]

*See also*, *e.g.*, *Murray v. E\*Trade Financial Corp.*, 240 F.R.D. 392 (N.D.Ill. 2006); *Cavin v. Home

Loan Center, Inc.*, 236 F.R.D. 387 (N.D.Ill. 2006); *Murray v. New Cingular Wireless Services, Inc.*,

232 F.R.D. 295 (N.D.Ill. 2005).

*GMAC Mortgage* is on point supporting plaintiff's arguments that a class should

be certified in this case. *GMAC Mortgage* held, in pertinent part, that:

> 1. the class action procedure "was designed for situations such as this, in which the
> potential recovery is too slight to support individual suits, but
> injury is substantial in the aggregate" [*GMAC Mortgage*, 434 F. 3d at

953];

2. statutory damages provide relief for actual losses that are small and hard to quantify, without proof of injury [*Id*.]; and

3. an award to the class "that would be unconstitutionally excessive may be reduced.... but constitutional limits are best applied after a class has been certified [when] a judge may evaluate the defendant's overall conduct and control its total exposure" [*Id*. at 954 (citing *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003))].

These factors set forth by the Seventh Circuit clearly indicate that the matter before this Court is suitable for class certification. Proof in this case is standardized—from the receipts that were given to Plaintiff and other consumers, to the hardware and software that produced them.

## III. STANDARD FOR CLASS CERTIFICATION

Classes have been certified in a number of FCRA cases brought under the FACTA amendments as follows: *Hammer v. JP's Southwestern Foods, L.L.C.*, 08-0339-CV-W-FJG, 2010 U.S. Dist. LEXIS 24259 (W.D. Mo. March 16, 2010); *Miller-Huggins v. Mario's Butcher Shop, Inc.*, 09 C 3774, 2010 U.S. Dist. LEXIS 16493 (N.D. Ill. Feb. 22, 2010); *Shurland v. Bacci Cafe & Pizzeri On Ogden, Inc.*, 08 C 2259, 2009 U.S. Dist. LEXIS 73309, (N.D. Ill. Aug. 19, 2009); *Razmig Tchoboian v. Parking Concepts, Inc.*, Case No. SACV 09-422 JVS (ANx), 2009 U.S. Dist. LEXIS 62122 (C.D. Cal. July 16, 2009); *Armes v. Shanta Enterprise, Inc.*, 07 C 5766, 2009 U.S. Dist. LEXIS 58385 (N.D. Ill. July 8, 2009); *Beringer v. Standard Parking Corp.*, No. 07 C 5027 and 07 C 5119, 2008 U.S. Dist. LEXIS 91568, 2008 WL 4390626 (N.D. Ill. Sept. 24, 2008); *Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 831 (N.D. Ill. 2008); *Harris v. Best Buy Co., Inc.,* et al., No. 07 C 2559, 2008 WL 4378476 (N.D. Ill. Mar. 20, 2008); *Redmon v. Uncle Julio's of Illinois, Inc.*, 249 F.R.D. 290 (N.D. Ill. 2008); *Matthews v. United Retail, Inc.*, 248 F.R.D. 210 (N.D. Ill. 2008); *Meehan v.*

*Buffalo Wild Wings, Inc.*, 249 F.R.D. 284 (N.D. Ill. 2008); *Harris v. Circuit City Stores, Inc.*, No. 07 C 2512, 2008 WL 400862 (N.D. Ill. Feb. 7, 2008); *Kesler v. Ikea U.S., Inc.,* Case No. SACV 07-00568-JVS (RNBx), 2008 U.S. Dist. LEXIS 97555 (C.D. Cal. Feb 4, 2008); *Troy v. Red Lantern Inn, Inc.*, No. 07 C 2418, 2007 WL 4293014 (N.D. Ill. Dec. 4, 2007); *Halperin v. Interpark, Inc.*, No. 07 C 2161, 2007 WL 4219419 (N.D. Ill. Nov. 29, 2007); *Reynoso v. S. County Concepts*, SACV07-373-JVS(RCx), 2007 U.S. Dist. LEXIS 95691 (C.D. Cal. Oct. 26, 2007).

In the present case, the critical issues are (a) whether Defendants has a practice of providing customers with a sales or transaction receipt that fails to comply with FACTA's truncation requirement; (b) whether Defendant thereby violated FACTA; and (c) whether Defendant's conduct was willful. Such claims can be resolved, in part or in whole, at summary judgment, as was the case in actions involving the prescreening of credit information. *Murray v. IndyMac Bank, FSB*, 461 F.Supp.2d 645 (N.D.Ill. 2006); *Murray v. Sunrise Chevrolet, Inc.*, 441 F.Supp.2d 940 (N.D.Ill. 2006). Both of these inquiries are uniform with respect to the entire class, and will be decided on facts that apply equally to all class members.

## IV. THE PROPOSED CLASS MEETS THE CERTIFICATION REQUIREMENTS

### A. NUMEROSITY

To establish numerosity a plaintiff is, "not required to allege the exact number or identity of the class members." *Hinman v. M and M Rental Center, Inc.*, 545 F. Supp 2d 802, 806 (N.D. Ill. 2008). Furthermore, a plaintiff can use statistical percentages to establish numerosity "beyond mere speculation" that the size of the putative class is sufficiently large. *Rahman*, 244 F.R.D. at 450.

Here, defendant has admitted that its credit card machines provided receipts with the

expiration date on them for the time period before this lawsuit was filed.  Lana Thai depo,

Exhibit A at 24-25.  Broadway's credit card transaction records indicate that there were

approximately 40,000 transactions during the class period, although the number of class

members will likely be substantially lower because it appears that the defendant supermarket's

clientele consists largely of repeat customers.  Counsel estimates approximately 10,000 class

members.

Also supporting numerosity are the thousands of "merchant copy" receipts with

expiration dates on them that Broadway's counsel has in its possession.  Exhibit B contains

photographs of boxes of merchant copy receipts, all of which have the expiration date on them,

just like the customer copies have on them.[1]  There is no question that numerosity is met.

**B.     COMMONALITY**

A common nucleus of operative facts is enough to satisfy the commonality requirement.

*Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir. 1992).  "A common nucleus is generally found

when the defendant has engaged in standardized conduct towards the members of the

proposed class."  *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 392 (N.D. Ill. 2006) (*citing Keele,*

149 F.3d at 594; *McCabe,* 210 F.R.D. at 644); *Hinman v. M & M Rental Ctr.*, 545 F. Supp. 2d 802,

806 (N.D. Ill. 2008) ("Seventh Circuit precedent teaches that commonality and typicality are

generally met where, as here, a defendant engages in a standardized course of conduct vis-a-vis

---

[1] Because of privacy considerations, plaintiffs' counsel has not attached photocopies of
the receipts, or photocopies of Broadway Supermarket's credit card statements hereto.
The deposition testimony appears to be sufficient evidence of numerosity.  If the Court
finds it appropriate to review these other materials, plaintiff's counsel will request leave
to file them under seal.

the class members and plaintiffs' alleged injury arises out of that conduct."); *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D. Ill. 1984) (Where a question of law involves "standardized conduct of the defendants toward members of the proposed class, a common nucleus of operative facts is typically presented, and the commonality requirement . . . is usually met."). When "at least one question of law or fact [is] common to the class," commonality is satisfied. *Tylka v. Gerber Prods. Co.,* 178 F.R.D. 493, 496 (N.D. Ill. 1998). Finally, "The commonality requirement has been characterized as a 'low hurdle' easily surmounted." *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992).

Here Defendant engaged in a common course of conduct towards plaintiffs and the proposed class members as though their point of sales terminals using a specific software programmed to obtain from Plaintiff's card and the cards of the class members the expiration date and to print that date it on its receipts. The alleged failure to comply with FACTA is the same for each person who received a noncompliant receipt; thus, each class member has the same claim. *GMAC Mortgage* held that this sort of question does not call for any sort of individualized inquiry. Accordingly, the questions of whether noncompliant receipts were provided and whether the FACTA violation was willful depends on facts involving Defendant's activities, and not the activities of Plaintiff or class members.

## C.     TYPICALITY

Commonality and typicality requirements under Rule 23 are interrelated and often to overlap. *Hyderi v. Washington Mutual Bank, FA*, 235 F.R.D. 390, 396 (N.D.Ill.2006). The "typicality" requirement of Rule 23(a)(3) is satisfied for many of the same reasons that the "commonality" requirement of Rule 23(a)(3) is met. *De La Fuente v. Stokley-Van Camp, Inc.,*

713 F.2d 225, 232 (7th Cir. 1993). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory". *Id.* Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). Typicality, "should be determined with reference to [the defendant's] actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

Here plaintiffs' and the class members' claims arise from defendant's use of the same credit card point of sales terminals that printed expiration dates on all receipts. Each member was subjected to the same conduct, obtaining the expiration date from the card presented to defendant to make a purchase and defendant's printing that expiration date on a receipt.

**D.     ADEQUACY**

Rule 23(a)(4)'s prerequisite consists of the following factors: (1) whether the plaintiffs' attorney is qualified, experienced, and generally able to conduct the proposed litigation; (2) whether the class representatives have interests that are antagonistic to the class; and (3) whether the class representatives have a sufficient interest in the case to assure vigorous advocacy. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993).

"Adequacy" is met when the representative's interests are not antagonistic to or in conflict with those of the other class members. *Uhl v. Thoroughbred Tech. and Telecom., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002). In a class action, "the class representative's role is limited." *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981). An adequate class representative need only be conscientious and have a basic

8

understanding of the litigation at hand. *Carbajal v. Capital One*, 219 F.R.D. 437, 442 (N.D. Ill. 2004). "[T]he standard for serving as class representative is not particularly demanding." *In re Ocean Bank*, 06 C 3515, 2007 U.S. Dist. LEXIS 29443 * 25 (N.D. Ill. Apr. 27, 2007). Plaintiffs are aware of the class claim they have asserted for statutory damages under the Fair Credit Reporting Act, have vigorously prosecuted this claim and defended a declaratory judgment claim filed against them in the Circuit Court of Cook County, Illinois EMCASCO and has communicated with his counsel. As such, Plaintiff is adequate and no antagonism exists between him and the class members.

The second consideration in determining adequacy of representation is whether plaintiff's counsel is qualified, experienced, and able to conduct the proposed litigation. *Rosario*, 963 F.2d at 1018; FED. R. CIV. P. 23(g). Plaintiff's counsel, Alexander Burke, has substantial experience litigating consumer class actions, and he or the law firm where he works or worked previously, has been appointed class counsel in cases where he is the lead attorney. E.g. *Cicilline v. Jewel Food Stores, Inc.*, 542 F.Supp.2d 831 (N.D.Ill. 2008) (Dow, J.) (FCRA class certification granted); *Harris v. Best Buy Co.*, 07 C 2559, 2008 U.S. Dist. LEXIS 22166 (N.D.Ill. March 20, 2008) (St. Eve, J.) (FCRA class certification granted); *Matthews v. United Retail, Inc.*, 248 F.R.D. 210 (N.D.Ill. 2008) (Castillo, J.) (FCRA class certification granted); *Redmon v. Uncle Julio's, Inc.,* 249 F.R.D. 290 (N.D.Ill. 2008) (Castillo, J.) (FCRA class certification granted); *Harris v. Circuit City Stores, Inc.*, 2008 U.S. Dist. LEXIS 12596, 2008 WL 400862 (N.D. Ill. Feb. 7,2008) (Schenkier, J.) (FCRA class certification granted); aff'd upon objection (Mar. 28, 2008). Counsel Kenneth DucDuong is also experienced in litigating class actions and consumer cases.

"The fact that attorneys have been found adequate in other cases is persuasive evidence that they will be adequate again.'" *Morris v. Risk Mgmt. Alternatives, Inc.*, 203 F.R.D. 336, 344 (N.D. Ill. 2001) (*quoting Gomez v. Illinois State Bd. Of Ed.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987)). Plaintiff's counsel submits the declaration of Alexander H. Burke in further support of his and his firm, Burke Law Offices, LLC's adequacy as class counsel and for the appointment pursuant to Fed.R.Civ.P. 23(g). Exhibit C.

### E.   PREDOMINANCE

Rule 23(b)(3) is met when "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." FED.R.CIV.P. 23(b)(3). The predominance requirement is met when a common factual link between the class members and defendants under which the law requires a remedy exists. *Smith v. Nike Retail Servs. Inc*. 234 F.R.D. 648, 666 (N.D. Ill. 2006); 7A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1778, at 528 (2d ed. 1986) (Predominance is met "when common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for having the dispute on a representative rather than on an individual basis"). "Generally, when a class challenges a uniform policy or practice, the validity of the policy or practice tends to be the predominant issue in the ensuing litigation." *CE Design Ltd*., 259 F.R.D. at 142 (*citing General Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 159 n.15, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).

The predominate common legal issue of whether Defendant acted willfully and recklessly predominates. The predominate common facts is that Defendant's point of sales

terminals printed every class members' credit card expiration date on electronically printed receipts.

F.     **SUPERIORITY**

In *GMAC Mortgage*, the Seventh Circuit held that cases such as this one, where hundreds of people have exactly the same claim, are well-suited for class resolution:

> [Fed.R.Civ.P] 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate. *See*, *e.g.*, *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344-345 (7th Cir. 1997). Reliance on federal law avoids the complications that can plague multi-state classes under state law, see *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation*, 288 F.3d 1012 (7th Cir. 2002), and society may gain from the deterrent effect of financial awards. The practical alternative to class litigation is punitive damages, not a fusillade of smallstakes claims. See *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003). [*GMAC Mortgage*, 434 F.3d at 953.]

Generally speaking, efficiency is the primary focus in determining whether the class action is the superior method for resolving the controversy presented. *Eovaldi v. First Nat'l Bank,* 57 F.R.D. 545 (N.D.Ill. 1972). The Court is required to determine the best available method for resolving the controversy in keeping with judicial integrity, convenience, and economy. *Hurwitz v. R.B. Jones Corp.,* 76 F.R.D. 149 (W.D.Mo. 1977). It is proper for a court, in deciding the "best" available method, to consider the "....inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1165 (7th Cir. 1974).  Reliance on the rare individual willing to incur the time and expense of seeking the small damages available is not sufficient to ensure that "it ought not to be cheaper to violate the Act and be sued than to comply with the statutory requirements. *Bueno v. Mattner*, 633 F. Sup.1446, 1467 (W.D. Mich. 1986).

11

Certifying a class is the "superior" way when the "'class action would achieve economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prods. v. Windsor,* 521 U.S. 591, 615 (1997) (quoting Adv. Comm. Notes, 28 U.S.C. App., at 697); *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 183 (N.D. Ill. 1992) ("Equally important, judicial economy and efficiency, as well as consistent judgments, are achieved by certifying the class.").

**CONCLUSION**

WHEREFORE, for the reasons above, plaintiff respectfully requests that this Court to certify this case to proceed as a class action, appoint plaintiffs as the class representatives, and appoint plaintiffs' counsel as counsel for the class.

Respectfully submitted,

/s/Alexander H. Burke

Alexander H. Burke
**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

# Exhibit A



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
HANK DRAGER and THOMAS LE, on behalf )
of themselves and all others          )
similarly situated,                   )
        Plaintiffs,         ) No. 2009cv6481
        vs.                 )
BROADWAY SUPERMARKET, an Illinois     )
corporation,                          )
        Defendant.          )

        The deposition of LANA THAI, called as a
witness for examination, taken before LISA SCHWAM,
CSR No. 840-4650, a Notary Public within and for the
County of Cook, State of Illinois, and a Certified
Shorthand Reporter of said state, at 155 North Michigan
Avenue, Chicago, Illinois, commencing on the 23rd day of
August, A.D. 2010, at 11:19 a.m.

**3**

1   APPEARANCES (CONTINUED):
2
3       LAW OFFICES OF PENGTIAN MA,
4       (2961 South Archer Avenue,
5       Chicago, Illinois  60608,
6       773-847-8889), by:
7       MR. PENGTIAN MA,
8       pma@lawpma.com,
9           appeared on behalf of the Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**2**

1   APPEARANCES:
2
3       BURKE LAW OFFICES, LLC,
4       (155 North Michigan Avenue,
5       Chicago, Illinois  60601,
6       312-729-5288), by:
7       MR. ALEX BURKE,
8       aburke@burkelaw.com,
9           appeared on behalf of the Plaintiffs;
10
11      KMD LAW OFFICE,
12      (1055 West Catalpa Avenue, Suite 216,
13      Chicago, Illinois  60640,
14      773-561-6587), by:
15      MR. KENNETH M. DUCDUONG,
16      kmdlawyer@yahoo.com,
17          appeared on behalf of the Plaintiffs;
18
19
20
21
22
23
24

**4**

1           (WHEREUPON, the witness was sworn.)
2               LANA THAI,
3   called as witness herein, having been first duly sworn,
4   was examined and testified as follows:
5       MR. BURKE:  My name is Alex Burke, and I, along with
6   Kenneth DucDuong, represent Hank Drager and Thomas Le in
7   the lawsuit Drager vs. Broadway Supermarket.  And we're
8   here today on notice of depositions served by me on
9   August 12th.  We have three 30(b)(6) topics and four
10  Rule 30 persons that are noticed up for deposition.
11      Just a moment ago I had a discussion with
12  Mr. Ma about production of witnesses produced pursuant to
13  Rule 30(b)(6) and wanted to put this on the record.  We
14  requested that the 30(b)(6) witnesses be produced in the
15  beginning, and I asked Mr. Ma who was being produced for
16  the three topics.
17      And your response, Mr. Ma?
18      MR. MA:  Yeah.  The first two topics, Lana
19  Thai can answer most of the questions, I believe.
20      And the third topic as to efforts to search for
21  the materials, I believe Henry Thai should be in a better
22  position or Henry Thai should have personal knowledge.
23      MR. BURKE:  So we object to having two
24  witnesses to testify as to a 30(b)(6) topic.

---

**5**

1   It's inappropriate. 30(b)(6) topics are people
2   who speak on behalf of the corporation. And
3   we're entitled to have complete responses as to
4   these particular issues and to have one person
5   testifying about what the corporation does or
6   doesn't do.
7        Are you prepared, Mr. Ma, to have Lana Thai --
8        MR. MA: Yes. I believe the rules say you
9   can designate one or more people to testify on
10  behalf of the company.
11       MR. BURKE: So what subjects is Lana Thai
12  going to testify about specifically?
13       MR. MA: That's the company's practice of
14  processing credit card receipts and the -- and
15  also to describe the system they have since a
16  certain date regarding the credit card processing
17  system. And how it is produced -- processed each
18  time when they need to process the credit card
19  receipts, as to how they do it.
20       MR. BURKE: And what is Henry Thai going to
21  testify about?
22       MR. MA: Henry Thai, I believe, has personal
23  knowledge as to how our office, just to contact
24  Henry Thai each time regarding materials. He

---

**6**

1   will provide information, and he will provide
2   documents. As to how they search documents, he
3   must have personal knowledge because we have
4   never talked to Lana Thai regarding the
5   documents.
6        MR. BURKE: So if I understand it correctly,
7   Lana Thai will testify today about Topics 1 and
8   2, and then Henry Thai will testify as to
9   Topic 3?
10       MR. MA: Right.
11       MR. BURKE: Okay.
12            EXAMINATION
13  BY MR. BURKE:
14  Q.   Thank you for coming, Ms. Thai.
15  A.   My pleasure.
16  Q.   Have you ever given a deposition before?
17  A.   No.
18  Q.   Okay. Here's the deal: I ask questions, and
19  you answer those questions. The court reporter here is
20  going to take down both my questions and your answers.
21  You've been sworn under oath so you must tell the truth.
22       If you don't understand a question, please let
23  me know and I'll try to clarify, okay?
24  A.   Okay.

---

**7**

1   Q.   And you have to speak up, and you have to give
2   audible answers because I know it's archaic, but the
3   court reporter has to write down what's said, not what's
4   done.
5        So if you nod your head, it doesn't really go
6   on the transcript, okay?
7   A.   Yes.
8   Q.   Are you on any medications that would prevent
9   you from testifying or telling the truth today?
10  A.   No.
11  Q.   Is there any reason that you know of that will
12  prevent you today from testifying truthfully and
13  completely?
14  A.   No.
15  Q.   Okay. If you ever want to take a break for any
16  reason, let us know and we'll just take a break. Except
17  I'd ask that if there's a question pending, that you
18  finish your answer, and then you can go do whatever you
19  want, okay?
20  A.   Okay.
21       (WHEREUPON, a certain document was marked
22       Exhibit E for identification as of
23       August 23, 2010, and is attached hereto.)
24  BY MR. BURKE:

---

**8**

1   Q.   I'm going to hand you what's been marked as
2   Exhibit E, like "Edward."
3        Have you ever seen this document before?
4   A.   Exactly like this, no.
5   Q.   Okay. This is the notice of deposition that I
6   sent to your lawyers asking that you and other employees
7   of Broadway Supermarket appear today, okay?
8   A.   Okay.
9   Q.   Do you see the first topic there, receipt and
10  processing, reading of incoming mail having to do with
11  credit card transactions and processing?
12       Do you see that?
13  A.   Yes.
14  Q.   Are you competent to speak on behalf of
15  Broadway Supermarket as to that subject?
16  A.   Are you saying the incoming mail, I open them
17  and things like that or how you going -- I don't quite
18  understand your question.
19  Q.   Well, in this case, we want to learn about
20  Broadway Supermarket's receipt processing and reading of
21  incoming mail.
22  A.   Okay.
23  Q.   Are you the person at Broadway Supermarket that
24  reads incoming mail?

9

1    A.  Yes.  When the mail come, I open them.  But
2    when the number, I look at the figure to roughly the
3    right number.  And then I give that to my --
4        MR. MA:  Just a response to the question.
5    Just a response.
6    BY THE WITNESS:
7        A.  Yes, I open the mail.
8    BY MR. BURKE:
9        Q.  Okay.  And do you open the mail every day?
10       A.  Not every day.
11       Q.  Okay.  How often do you open the mail?
12       A.  About two to three times a week.
13       Q.  Okay.  Is there anyone else at Broadway
14   Supermarket that's responsible for opening mail?
15       A.  No.
16       Q.  Okay.  When you receive the mail -- from where
17   do you receive it?
18       A.  Downstairs, they drop it at the cashier.
19       Q.  Okay.  In, like, a mailbox or something?
20       A.  No.
21       Q.  No?  How does that work?
22       A.  They just hand it to the cashier, and they put
23   in the drawer.
24       Q.  Okay.  And then every day or couple of days,

10

1    you go and retrieve the mail?
2        A.  Yes.
3        Q.  Do you take it to your office?
4        A.  Yes.
5        Q.  Okay.  And you sit at your desk or in a
6    chair?
7        A.  Not all the time.
8        Q.  Okay.  How do you -- do you have a process
9    whereby you generally open the mail?
10       A.  Because we're a grocery store.
11       Q.  Okay.
12       A.  So I run back and forth.  Wherever the customer
13   need, I go first.  And the mail, I usually leave it
14   behind.  And then I'll read it when I get time.  I just
15   open and read it.
16       Q.  Okay.  And do you sometimes -- does Broadway
17   Supermarket sometimes receive mail concerning credit
18   cards?
19       A.  Yes.
20       Q.  Are there some companies that it regularly
21   receives mail from concerning credit cards?
22       A.  You mean, the monthly credit -- monthly
23   statement?
24       Q.  I think that that would be part of what I'm

11

1    asking about, yes.
2        A.  Yeah.  The monthly statement, yes.
3        Q.  Okay.  From whom does Broadway Supermarket
4    receive monthly statements?
5        A.  They mail directly to the market.
6        Q.  Okay.  And is that part of the mail that you
7    open?
8        A.  Yeah, open.  I give it to my CPA.
9        Q.  Who is the CPA?
10       A.  Raymond Tu, T-u.
11       Q.  Do you review such mail before you forward it
12   to the CPA?
13       A.  I look at the first page where the figure at,
14   and then I look at figure is right.  I give it to him.
15       Q.  So you never look past the first page?
16       A.  See, I don't have time.  Not that I don't want
17   to, but I don't have time.
18       Q.  Okay.  Let's back up a little bit.
19       A.  Okay.
20       Q.  What is Broadway Supermarket?
21       A.  It's a grocery store, and we have both retail
22   and wholesale.
23       Q.  And where is it located?
24       A.  4879 North Broadway.

12

1        Q.  And I don't even know if I asked you your name.
2    Please state your name for me.
3        MR. MA:  Yes, I was thinking about it.
4    BY THE WITNESS:
5        A.  My name is Lana Thai.
6    BY MR. BURKE:
7        Q.  And Ms. Thai, do you reside in Chicago?
8        A.  I reside in Lincolnwood, and I also -- my
9    husband live in Addison.  That's why I have to go back
10   and forth when I work.  I stay close to Chicago, but I
11   still go back home to Addison to see my babies.
12       Q.  And what is your position at Broadway
13   Supermarket?
14       A.  I'm -- well, I work with my brother.  As a
15   family business, we don't all have one focus.  Pretty
16   much wherever is needed and wherever is busy, we
17   have to.
18       Q.  And who is your brother?
19       A.  My brother is Henry Thai.
20       Q.  So are there other family members who work in
21   the business?
22       A.  Andy Thai and Phung Thai is also my brothers.
23       Q.  Does Henry Thai have a formal position with
24   Broadway Supermarket?

## 13

1    A.  How can I say that?  I don't know how to
2    describe.
3        As a family business, we pretty much pitch in
4    where is needed.  But most of the time, he is working all
5    doing dry products, and also he is put -- when the
6    products come in, we have to receive the products and put
7    on the shelf.  And also our customer, when there's
8    wholesale order, we have to pull all those orders.
9        That's what he's mostly.
10   Q.  What is your responsibility?
11   A.  My responsibility is I have to update all the
12   pricing because prices changes day by day.  And also I
13   have to do cashier because we don't have a lot of -- we
14   only work couple of people in the stores, so whenever the
15   cashier register need, I have to be there.
16       And also I have to take care of wholesale
17   customer because we sell to other market.  They come in
18   to pick up the merchandise so I have to take care of
19   them.  And also look after the numbers and also send
20   whatever letter I need to give to CPA or whoever supposed
21   to give it to, then I just hand it to those individual
22   and file it.
23   Q.  And file it.  And you open the mail?
24   A.  Yes.  It's a lot of things.  That's why I'm

## 14

1    sorry that, really --
2    Q.  So Andy Thai, what is Andy's responsibility?
3    A.  Andy, he is -- he go out to buy stuff from
4    other wholesaler and bring it back to sell, and also he
5    also deliver to restaurant and other small market every
6    day when they need it to give, he have to do all those.
7    And also put stuff onto the shelf to sell things like
8    that.  Take care of those things.
9    Q.  And what about Phung Thai?
10   A.  Phung Thai, he usually stay in the warehouse.
11   So he is working part of the warehouse.  When we need
12   him, we just call him and ask him what we need and ask
13   and ship it over to us.
14   Q.  What is your relationship with Phung Thai?
15   A.  He is my oldest brother.
16   Q.  So Andy, Henry and Phung are your three
17   brothers?
18   A.  Yes.
19   Q.  And are your parents involved in the
20   business?
21   A.  They pass away.
22   Q.  Sorry to hear that.
23       How about are there any other brothers or
24   sisters involved with the business?

## 15

1    A.  I have one brother also pass away in 2005.
2    Q.  What about Nancy?
3    A.  Nancy is my sister.
4    Q.  Is she the secretary?
5    A.  She is -- she take care of the cashier most of
6    the time.  She didn't do anything else.
7    Q.  So what does that mean, "take care of the
8    cashier"?
9    A.  She is a cashier, meaning, cashier, check out,
10   things like that.  When she need help, she will call us
11   and we'll help.
12   Q.  Whose job at Broadway Supermarket is it to
13   ensure that Broadway Supermarket is compliant with the
14   laws that apply to the business?
15   A.  That's me.
16   Q.  Okay.  What do you do to make sure that you
17   know about all the laws that apply to Broadway
18   Supermarket's business?
19   A.  Because we grocery store, there's not much of
20   the law that we have to involve.  So I just go day-by-day
21   business.  I'm just lack of the experience.
22   Q.  Okay.  So does Broadway Supermarket subscribe
23   to any periodicals, for example, concerning
24   Supermarkets?

## 16

1    A.  No.
2    Q.  No magazines, no trade organizations?
3    A.  No.
4    Q.  So would it be accurate to say that if you
5    found out about some law that applied to Broadway
6    Supermarket's business, it would be by accident?
7    A.  No.  We assume that when there is a law that
8    regulate, they send some kind of special letter, like
9    registered mail and things like that that go to the
10   attention that we know is something very important.
11       But other than that, we did not know that such
12   law exists.
13   Q.  For example, there are laws, I think, in
14   Chicago -- or at least in Illinois -- that concern
15   pricing of Supermarket items.
16       Are you aware of any such laws?
17   A.  Pricing.  Well, the city will mail to us and
18   let us know that we -- they let us know ahead of time
19   that you have to -- wherever you're pricing in the
20   computer system, your label had to match exactly.  And
21   they come to check once a year.  If we do have some
22   mismatch, if it's not major, they would not give us a
23   ticket; they just give us warning.
24       But if there is, like, major things, like a

## 17

1  couple dollars or a little more, then they just give us a
2  ticket.  Like, we have to go to court to pay the fine for
3  that mistake.
4      Q.  And I think you said the city sent you a letter
5  before the law became effective?
6      A.  No, not that law.
7      Q.  Okay.  So you learned about the law after the
8  city came to inspect?
9      A.  No.  When we first open the store, when we have
10 a system, the city will come to inspect right away.  They
11 do everything before we open.
12     Q.  I see.
13     A.  Yeah.
14     Q.  When was Broadway Supermarket opened?
15     A.  In 1996.
16     Q.  Have you been -- I see here it says that you're
17 the director and treasurer.
18         Would that be accurate?
19     A.  Family business; there's no such thing.
20     Q.  Okay.  Have you had the responsibilities that
21 you listed earlier such as updating the pricing,
22 overseeing the cashiers, dealing with wholesale customers
23 and looking after the numbers, since the beginning of
24 Broadway Supermarket?

## 18

1      A.  Yes.
2      Q.  Okay.  Along the way in the past -- I think you
3  said 1998 you opened?
4      A.  1996.
5      Q.  '96.
6          Have there been instances where you realized
7  all of a sudden that there was something that you should
8  have been doing, and so then you fixed your practices and
9  brought your business back into compliance?
10     A.  I don't understand.
11     Q.  Well, I'm trying to get an idea about how your
12 business -- or you might come to learn about rules or
13 laws that apply to the business.  And I think what you're
14 telling me is that you don't do anything affirmative, you
15 don't reach out to learn what laws might apply; is that
16 correct?
17     A.  If there's a law, usually the city or the state
18 will mail a letter -- a special letter -- that will let
19 you know that there's some changing.  And then I will ask
20 my CPA or whoever to help explain it to me or what's
21 going on.  But because of this letter, I not aware
22 because it did not come in a special kind of registered
23 mail or anything like that to let me know, this is you
24 have to read this.  If I don't understand, you need to

## 19

1  give it to my lawyer or CPA, someone who have knowledge
2  of that.
3          But I did not have so it's my -- it's
4  reckless.
5      Q.  Does Broadway Supermarket have an attorney that
6  regularly assists with its business?
7      A.  No, we don't.
8      Q.  What is the company that sends Broadway
9  Supermarket monthly statements concerning credit cards?
10     A.  It's EXC.
11     Q.  EXS?
12     A.  X.
13     MR. DUCDUONG:  Electronic Exchange System?
14     THE WITNESS:  Yeah.
15     MR. BURKE:  Okay.
16 BY MR. BURKE:
17     Q.  Has Broadway Supermarket ever received notice
18 from a federal authority of new laws that apply to its
19 business?
20     A.  They do mail it when there is, but this law, I
21 didn't see it.
22     Q.  Well, I'm just asking whether you can recall an
23 instance where federal authorities mailed registered mail
24 or otherwise notice of a change in federal law.

## 20

1      A.  Not that I know of.
2      Q.  Okay.  And does Broadway Supermarket do
3  anything to ensure that it's in compliance with federal
4  laws?
5      A.  My CPA will tell me if there's a mail, like I
6  said.  When there is a mail from the state or the federal
7  or the city, if I don't understand those, I will ask my
8  CPA or someone who is superior than me outside my company
9  to help me with it.
10     Q.  Did Broadway Supermarket ever ask the CPA or
11 any other person to assist it with compliance with credit
12 card processing laws?
13     A.  No.  Not the CPA, no.
14     Q.  Anyone else?
15     A.  Because we -- our system is -- the computer
16 system, it has been done by Linus International so they
17 are professional in that area.  So we have that ever
18 since we open.
19     Q.  Was there an agreement with Linus International
20 that Linus would assist in compliance with credit card
21 processing laws?
22     A.  I don't know if there is agreement or not, but
23 my system was -- we have a fire in 2006 so that system
24 was new at that time.  We were told that the system is

## 21

1 new so we need everything to be in compliance with the
2 law today.
3    Q. What made you believe that Linus -- that the
4 system that Linus installed would be compliant with all
5 the laws that concerned credit card processing?
6    A. Because we believe they are professional --
7 they're professional.
8    Q. Did Linus ever tell Broadway Supermarket that
9 it would ensure that its credit card processing equipment
10 would be compliant?
11    A. Did they tell me that? They didn't tell me
12 that time.
13    Q. Did they do anything to make you believe that
14 their credit card processing systems would be compliant
15 with federal law?
16    A. I believe they implied.
17    Q. How did they imply it?
18    A. Because they told me I give you the newest
19 system.
20    Q. Was compliance with federal or any other law
21 ever discussed or implied?
22    A. They never tell me.
23    Q. Have you ever attended a trade show meeting
24 concerning Broadway Supermarket's business?

## 22

1    A. No.
2    Q. Is Broadway Supermarket a member of the
3 National Retail Federation?
4    A. What's that?
5    Q. It's a trade group of retail stores.
6    A. No.
7    Q. How about Grocery Retailing?
8    A. No.
9    Q. Illinois Retail Merchants Association?
10    A. No.
11    Q. Illinois Food Retailers Association?
12    A. No.
13    Q. Why not?
14    A. I don't know.
15    Q. Did you ever work as a cashier -- have you ever
16 worked as a cashier at the supermarket?
17    A. Yes, I do.
18    Q. When you were working as a cashier, did you
19 sometimes take credit cards for payment?
20    A. Yes.
21    Q. From customers?
22    A. Yes.
23    Q. How many credit card terminals are there at
24 Broadway Supermarket?

## 23

1    A. We only have three, but we use two to scan.
2    Q. And what is the third? Why is it not used?
3    A. Because we don't have enough cashier now. We
4 don't have that much of customer.
5    Q. Okay. Have you used that third terminal in the
6 last three years?
7    A. Yes.
8    Q. Yes?
9    A. Yes, once in a while.
10    Q. Once in a while? When it's really busy
11 maybe?
12    A. Yes.
13    Q. When you perform transactions using the credit
14 card terminals, did you have a practice of giving the
15 customer a copy of his or her receipt?
16    A. Yes. We have to give the customer receipt,
17 yes.
18    Q. Why do you have to give the customer a
19 receipt?
20    A. Because the printout, what we charging them.
21    Q. Okay. But why does the customer have to get a
22 receipt?
23    A. Receipt of what they're buying.
24    Q. Okay.

## 24

1    A. And how they paid for the food.
2    Q. Did you notice that some of the receipts that
3 you provided to customers had the expiration date on
4 them?
5    A. At that time, yeah, I do know there's an
6 expiration date.
7    Q. Okay. And you noticed that before this lawsuit
8 was filed?
9    A. Can you clarify the question.
10    Q. I'm just wondering, you know, over the last
11 three years or so, did you notice that some of the
12 receipts that you gave customers had the expiration date
13 for the customer's credit card?
14    A. Yes.
15    Q. And you did notice that?
16    A. I know there is expiration date on it, yes.
17    Q. Okay. And was that the way the machines
18 typically printed out the expiration date before this
19 lawsuit was filed?
20    A. Yes.
21    Q. Okay. So certainly, there would be more than
22 40 receipts that were given out with the expiration date
23 on them?
24    A. I don't know.

## 25

1    Q.   Okay.  But it would make sense that there would
2  be more than 40 such receipts that were given out over
3  the two years before the lawsuit was filed?
4    A.   I don't understand your question again.
5    Q.   Well, I'm just trying to get an idea.  I
6  suspect there were thousands and thousands of receipts
7  like that.
8         What I'm asking you is just the bear minimum,
9  you know, do you think that it's reasonable to
10 understand, since the processing machines were printing
11 expiration dates on credit card receipts for the
12 customer, that there were more than, say, 40 that were
13 printed like that and given to customers?
14   A.   Yes.  Before the lawsuit, yes.
15   Q.   Okay.  And after the lawsuit, it stopped,
16 right?
17   A.   Yes.  We find out such law regulation, we call
18 Linus right away.  We say, what's going on with this?  I
19 said, you have to fix it for me.  We didn't know.  And
20 they fixed it for us.
21   Q.   Did they have to come to Broadway Supermarket
22 to fix it?
23   A.   No.
24   Q.   No?  They just flipped a switch or something in

## 26

1  Linus International and it was fixed?
2    A.   Yes.
3    Q.   And was it almost instantaneous, same day?
4    A.   I think almost.  Next day.  I think they have
5  to do some programming or something.
6    Q.   Okay.
7    A.   I have no background.
8    Q.   Has Broadway Supermarket changed its practices
9  as to outwardly and affirmatively trying to figure out if
10 it's complying with federal laws since this lawsuit was
11 filed?
12   A.   Yes.
13   Q.   How?
14   A.   We pay more attention to the letters.
15   Q.   The letters from whom?
16   A.   From credit card, from -- because they usually
17 junk mail, so those mail we open too because we --
18 usually we don't -- junk mail, there's a lot of junk
19 mail.
20   Q.   Right.  Do you think maybe it would have been
21 better if you had read the entire monthly statements
22 from EXS?
23   A.   Yes, I should have.
24   Q.   Why?

## 27

1    A.   Because like I have -- we have so much thing to
2  do and for reading letters, sometime we just oversight
3  that recklessly.  I just missed it.
4    Q.   Why would it have been better had you read
5  those statements?
6    A.   Then I wouldn't have this problem.
7    Q.   Because the statements told you to visit a Web
8  site, didn't they?
9    A.   I'm not very good with computer so that's --
10   Q.   The statements from EXS contained warnings
11 about expiration dates on credit cards, didn't they?
12   MR. MA:  Objection.  If you have a document,
13 show her.  Probably if you say the document said
14 this, and we have to see the document.  She can
15 not answer a question just to say the document
16 warns you about expiration dates.  I don't think
17 there is such a document.
18   MR. BURKE:  She certainly can answer it if
19 she knows the answer.  Maybe later we'll show
20 some documents.
21   MR. MA:  The question is confusing.
22   MR. BURKE:  Mr. Ma, please do not talk on
23 top of me.
24   MR. MA:  I have to.  I have the right to

## 28

1  make my objections.
2    MR. BURKE:  Absolutely, but not speaking
3  objections.  And you don't have the right to talk
4  on top of me because we're making a transcript.
5    MR. MA:  I'm making objections.  We have
6  exchange of opinions right now as to how you
7  posed the question.  You say there is a document
8  warning the business owners regarding expiration
9  date.  She cannot answer the question because you
10 have to show her the document.  Otherwise, the
11 question is confusing.
12   MR. BURKE:  If she doesn't understand a
13 question, Ms. Thai knows to tell me.  Mr. Ma --
14   MR. MA:  I'm raising my objections.  I'm
15 raising my objections.  I have to talk to you.
16   MR. BURKE:  Do not talk on top of me.
17   MR. MA:  I did not talk -- am I talking on
18 top of you?  I just respond to your responses.
19      You know, you cannot say there is such a thing,
20 and then she will be confused.
21   MR. BURKE:  Are you finished?
22   MR. MA:  Yeah.
23 BY MR. BURKE:
24   Q.   Do you recall seeing documents ever that

LANA THAI                                                        AUGUST 23, 2010

---

**29**

1  cautioned Broadway Supermarket to make sure that the
2  expiration dates did not appear on their credit card
3  receipts?
4      A.  No.
5      Q.  Never?
6      A.  Never.
7      Q.  Not even after this lawsuit was filed?
8      A.  No.
9      Q.  I think you testified a moment ago that had you
10 read the monthly statements from EXS, maybe we wouldn't
11 be here today.
12     Is that accurate?
13     A.  Yes.
14     Q.  What did you mean?
15     A.  If we do read the letter, then we notice
16 that -- there are certain things that we don't
17 understand, we can ask the professional to help us.
18     Q.  So would it be accurate to say that had you
19 read the whole statements, you would have known that
20 something was wrong with the credit card receipts?
21     A.  With the knowledge of my English, I don't
22 really know every single word I'm reading.  I don't
23 comprehend every word I know of so I don't know.
24     Q.  You don't know?

---

**30**

1      A.  (Witness nods.)
2      Q.  So your English isn't that good?
3      A.  Not native, no.
4      Q.  Where did you grow up?
5      A.  I born -- I came here -- I born in Vietnam.  I
6  came here when I was 11.
7      Q.  11.  And did you go to public school in the
8  United States?
9      A.  Yes, I go to public schools.
10     Q.  Beginning in 6th grade?
11     A.  Yes.
12     Q.  And how much education did you finish?
13     A.  I finish my college.
14     Q.  Through college?
15     A.  Yes.
16     Q.  Where did you go to college?
17     A.  U of I.
18     Q.  University of Illinois Chicago?
19     A.  Yes.
20     Q.  What was your major?
21     A.  I was major in information.
22     Q.  Information technology?
23     A.  Yeah.
24     Q.  And where did you go to high school?

---

**31**

1      A.  Mather High School.
2      Q.  Where is this high school?
3      A.  On Peterson.
4      Q.  Peterson and what?
5      A.  It's by Peterson and California.
6      Q.  Peterson and California.
7      Where did you go to middle school before you
8  went to high school at Peterson and California?
9      A.  Grammar school is in Gale School.
10     Q.  And where is that, roughly?  In Chicago?
11     A.  Yeah.  In north side of Chicago.
12     Q.  Did you attend special classes for persons who
13 were born in Vietnam or didn't speak English well?
14     A.  English as a Second Language, yes, I did.
15     Q.  Okay.  Did you learn English in the public
16 school system?
17     A.  Yeah, I learn it here.
18     Q.  Okay.  And did you go to college -- I'll start
19 that one over.
20     When you went to college, did you learn in
21 Vietnamese or in English?
22     A.  English.
23     Q.  Did you write papers and take tests?
24     A.  Yes.

---

**32**

1      Q.  In English or Vietnamese?
2      A.  In English.
3      Q.  Okay.  Did you receive your degree in
4  information technology?
5      A.  Yes, I did.
6      Q.  After how many years?
7      A.  After five years.
8      Q.  Five years?  Okay.
9      Was it a full-time college or did you go part
10 time?
11     A.  Full-time college.
12     Q.  Did you write any sort of dissertation or
13 anything like that to finish school?
14     A.  Only what you call it, Composition 101.
15     Q.  So you were an information technology major.
16 What is information technology?
17     A.  More in mathematics, probabilities, things like
18 that.
19     Q.  So not computers?
20     A.  Computer some, but not.  More with calculations
21 and things like that.
22     Q.  When did you graduate?
23     A.  In 1992, I believe.  I forgot actually.
24     Q.  I understand.

## 33

1      A.   Too long.
2      Q.   Yeah.
3           Does Broadway Supermarket have a computer?
4      A.   For the pricing for the system, yes.
5      Q.   Is that computer connected to the Internet?
6      A.   No.
7      Q.   There's no Internet access at all?
8      A.   No.
9      Q.   Do you have a computer at home?
10     A.   Personal, yes.
11     Q.   Do you sometimes use that computer for your
12   job?
13     A.   No.
14     Q.   No?
15     A.   I never -- I pretty much don't have time for
16   it.
17     Q.   If -- strike that.
18          Do you recall other than these monthly
19   statements from EXS ever receiving any other mail
20   concerning credit cards?
21     A.   No.
22     Q.   Do you recall what time of the month these EXS
23   monthly statements usually arrived?
24     A.   Usually, if I'm not wrong, the end of the

## 34

1    month.
2      Q.   And when you received them, I think you
3    testified earlier that you looked at the front page only;
4    is that right?
5      A.   I look at the figure to see if the number for
6    the month is pretty close to be right.
7      Q.   And then what did you do with them?
8      A.   Then I give it to the CPA to do the
9    paperwork.
10     Q.   And did you place them in a file at any time?
11     A.   I put it in one stack.  When I give it to my
12   CPA, I give the whole thing to him.
13     Q.   How often did you give the stack to the CPA?
14     A.   Not every month.
15     Q.   Okay.
16     A.   I don't recall how often, but sometimes we have
17   time, we get everything over there, give it to him.  If
18   not, then we just wait for a little bit.
19     Q.   Like maybe every three or four months, every
20   year?
21     A.   No.  Two or three months, three or four
22   months.
23     Q.   And how long has Broadway Supermarket been
24   working with a CPA?

## 35

1      A.   Ever since we open.
2      Q.   And to your knowledge, has anyone asked the CPA
3    if he has any documents concerning credit card receipts
4    or truncation having to do with this case?
5      A.   No.
6      Q.   If you asked the CPA, would he give you those
7    documents?
8      A.   If I asked, they will help me redo it.  I don't
9    know.  I never tried so ...
10     Q.   But if you called up the CPA and said, hey, you
11   know, I've been giving these monthly statements for the
12   last 15 years, would you please -- you know, can I come
13   over and pick up the last four years' statements, do you
14   think he would object to such a request?
15     A.   I don't know.
16     Q.   If you asked for the documents for the EXS
17   statements, do you think that the CPA would give them
18   back to you?
19     A.   I think so if I -- I don't know.
20     Q.   You think so?
21     A.   I think so, yeah.
22   MR. BURKE:  Okay.  Let's take a quick break.
23        (Recess was taken.)
24   MR. BURKE:  I have a couple quick questions, and

## 36

1    then Kenneth's going to ask some questions about these
2    documents.  And then I think we'll be finished with this
3    witness.
4    MR. MA:  Okay.
5    BY MR. BURKE:
6      Q.   You testified earlier, I think, that you recall
7    seeing expiration dates on credit card receipts that were
8    provided to the customer, right?
9      A.   Yes.
10     Q.   Before the lawsuit was filed?
11     A.   Yes.
12     Q.   Did it strike you as strange that the
13   expiration dates were on the receipts?
14     A.   No.
15     Q.   And are you aware that expiration dates are
16   part of the security of a credit card?
17     A.   No.
18     Q.   No?
19     A.   No.
20     Q.   Expiration dates provide additional security
21   beyond the credit card number to ensure that there's no
22   fraud involved in the transaction.  So for example, if
23   you've ever purchased something on the phone, maybe the
24   merchant asks for your expiration date.

## 37

1     Has that ever happened?
2     A.  Yes.
3     Q.  Have you ever wondered why they ask for the
4  expiration date?
5     A.  No.
6     Q.  Okay.  Well, that's the primary reason why they
7  ask for it.
8     When you gave out those receipts, did you ever
9  see receipts that had the full credit card number on
10 them?
11    A.  No.
12    Q.  Okay.  Not even before the fire?
13    A.  No.
14    Q.  Okay.  To your knowledge, did the receipts
15 change, the receipts that were being printed by the
16 credit card processing machine, that were being given to
17 the customers, did those change between when Linus
18 installed the system to when the lawsuit was filed?
19    A.  I don't think so.  I have no knowledge of it.
20 No, I don't.
21    Q.  To your knowledge, did they change?
22    A.  No.
23    Q.  Okay.  And were both -- were all three credit
24 card processing terminals printing the expiration date on

## 38

1  the customer copy before the lawsuit was filed?
2     A.  I think so, yes.
3     MR. BURKE:  Okay.
4         EXAMINATION
5  BY MR. DUCDUONG:
6     Q.  Ms. Thai, I'm going to show you a couple of
7  documents, and I'm going to ask you to tell us if you
8  recognize the documents; that you received it and whether
9  or not you have signed the documents.  The first one is
10 Exhibit D.
11    (WHEREUPON, a certain document was marked
12    Exhibit D for identification as of
13    August 23, 2010, and is attached hereto.)
14 BY MR. DUCDUONG:
15    Q.  This is Exhibit D.  Do you recognize this
16 document?
17    A.  Yes.
18    Q.  Okay.  On the merchant information, is Broadway
19 Supermarket's name on it?
20    A.  Yes.
21    Q.  On the next box -- and you recognize the
22 correct address of Broadway Supermarket?
23    A.  4879, yes.
24    Q.  How about the phone number?  Could you read

## 39

1  that out loud for me, please.
2     A.  Yes, that's the right phone number.
3     Q.  Can you read it out loud for me.
4     A.  773-334-3838.
5     Q.  And that's the correct phone number to
6  Broadway Supermarket?
7     A.  Yes.
8     Q.  How about the fax number?
9     A.  The fax number is not the -- the fax number is
10 different now.
11    Q.  Can you read it out loud.
12    A.  The one right here in the box?
13    Q.  Yes.
14    A.  773-878-7126.
15    Q.  And the next line is -- go to contact name.
16 And that's your name, Lana?
17    A.  Yes.
18    Q.  Or Henry.  And that's Henry Thai; is that
19 correct?
20    A.  Yes.
21    Q.  On the next box, do you see your name on it,
22 Lana T. Thai?
23    A.  Yes.
24    Q.  Okay.  And at the time on this application,

## 40

1  Exhibit D, you indicated you own 100 percent of
2  supermarket.
3     And that's correct?
4     A.  Our family, yes.  Our family own 100 percent.
5     Q.  Okay.  Is that you or the entire family?
6     A.  The entire family.
7     Q.  So this is not correct?
8     A.  I believe they mean supermarket is owner
9  100 percent.
10    Q.  If you'd turn to the next page, it's two-sided.
11 On the signature line in the middle of this page 2 --
12    A.  This one?
13    Q.  -- is that your signature?
14    A.  No.  No, that's not my signature.
15    Q.  Okay.  What about the next one toward the
16 bottom?
17    A.  No, that's not my signature.
18    Q.  Not your signature?
19    A.  No.
20    Q.  It's not?
21    A.  No.
22    Q.  Okay.  The next box, it says, "Lana Thai."
23    Does it say, "Lana Thai"?
24    A.  Yes.

LANA THAI                                    AUGUST 23, 2010

## 41

1    Q.  This is not your signature?

2    A.  It's Henry Thai.

3    Q.  Is that your signature?

4    A.  Not my signature.

5    Q.  Who signed it?

6    A.  Henry.  Henry Thai.

7    Q.  Henry Thai.  Okay.

8    A.  Yes.

9    Q.  And you put your name there?

10    A.  I did whatever they ask us to do.

11    Q.  Okay.  And the title -- and this is -- what's

12 the date the application was signed?

13    A.  It seems to be February 9th, 2006.

14    Q.  Okay.  And you were the president of

15 Broadway Supermarket at the time?

16    A.  Like I said, I don't have much of a title.

17    Q.  Let me back up a little bit.

18    So this signature on page 2 belongs to

19 Henry Thai?

20    A.  Yes.

21    Q.  Did you write your name on it or Henry write

22 your name on it next to it?

23    A.  I don't recognize.  I don't know if I write

24 this or the person who prepared the application for it

## 42

1 write it.

2    Q.  So either you or Henry write your name?

3    A.  Think so.

4    Q.  Okay.  If you'd turn to the next page.  This is

5 provided by your counsel.  It's basically a blank

6 document -- blank application.

7    A.  Okay.  This one.

8    Q.  And there are some terms of the application, as

9 well.

10    Is this the whole thing?  Do you recognize this

11 is the application?

12    A.  You said this entire application?

13    Q.  Right.

14    A.  Your question is?

15    Q.  Well, what happened was -- I give you a little

16 background.  What happened was that your counsel provide

17 only the first three pages of the application, page 1,

18 page 2 and page 3, and we were asking for the entire

19 application.  And later on, your counsel provided a blank

20 application.

21    And we want to know if you recognize this

22 application and the five pages of terms and conditions as

23 the entire application.

24    A.  I don't quite understand.

## 43

1    Q.  This whole thing, is this the entire

2 application?

3    A.  Yes.

4    Q.  Yes?

5    A.  Do I know this -- do I understand this page

6 or -- what's your question?

7    Q.  Well, I was asking whether or not this is the

8 entire application, including these terms and condition

9 pages.

10    A.  When I sign it?

11    Q.  The whole application.

12    A.  I don't have this.  I only have the page where

13 we wrote down our store name, our name.  That's pretty

14 much it.

15    Q.  Who filled out this application?

16    A.  We sit down and the person from the bank, they

17 help us fill out, yeah.

18    Q.  Okay.  And Henry Thai signed the application;

19 is that correct?

20    A.  Yes.

21    Q.  What bank?

22    A.  Kalid.

23    Q.  Let me direct you to the top of page 1 of the

24 application on the top right corner.  That's the name --

## 44

1 sales representative name.  Would you say that out loud.

2    A.  Kalid Hassouns.

3    Q.  Will you spell the last name.

4    A.  H-a-s-s-o-u-n-s.

5    Q.  Okay.  And that's the person who helped you

6 fill out the application?

7    A.  Right.

8    Q.  And you signed it?

9    A.  Yes.

10    Q.  And you hired him to fill out this application

11 for you -- for the business?

12    A.  They are from the bank.

13    Q.  Okay.  The next exhibit I'm going to show you

14 is the receipts -- credit card receipts of the

15 Plaintiffs.

16    (WHEREUPON, certain documents were marked

17 Exhibit C-1 & C-2 for identification as of

18 August 23, 2010, and are attached hereto.)

19 BY MR. DUCDOUNG:

20    Q.  Now, these receipts, these names on it, you

21 recognize this receipt belongs to Broadway Supermarket?

22    A.  Yes, this receipt.

23    Q.  In the middle toward the end, would you say out

24 loud the name belong to this credit card.

## 45

1     A.  Le, Thomas.
2     Q.  Thomas Le; is that right?
3     A.  Yes.
4     Q.  And do you recognize there's an expiration date
5  printed on it?
6     A.  Yes.
7     Q.  Okay.  It tells the expiration date of this
8  credit card?
9     A.  Yes.
10    Q.  Would you tell us the expiration date.
11    A.  04/12.
12    Q.  That would be April, right?
13    A.  Yes.
14    Q.  April 2012?
15    A.  '12, yes.
16    Q.  Okay.  And the merchant with the numbers
17  008390029266, that's Broadway Supermarket merchant
18  numbers?
19    A.  On top, yes.
20    Q.  Is that right?
21    A.  Yes.
22    Q.  Turn to the next page, Exhibit C-2.  I'm going
23  to ask you the same question.
24        Do you recognize this receipt?

## 46

1     A.  Yes.
2     Q.  This receipt belongs to Broadway Supermarket?
3     A.  Yes.
4     Q.  Printed from Broadway Supermarket cashier?
5     A.  Yes.
6     Q.  Can you tell us the name this credit card was
7  belong to.
8     A.  Drager, Hank.
9     Q.  Hank Drager.  I think the way they put it, they
10  put last name first and first name last with a slash.
11    A.  Right.
12    Q.  And you see there's an expiration date printed
13  on this receipt?
14    A.  Yes.
15    Q.  Okay.  Would you tell us the expiration date.
16    A.  September 2013.
17    Q.  Okay.  The next document is a big document.
18  These are merchant statements, documents.  You may have
19  different name for it, but monthly merchant statements.
20        (WHEREUPON, a certain document was marked
21        Exhibit A for identification as of
22        August 23, 2010, and is attached hereto.)
23  BY MR. DUCDOUNG:
24    Q.  What I'm going to do is it's pretty thick.

## 47

1  We're not going to go through each page, but we're going
2  to go through some of these pages.
3        I'm going to ask you to tell us whether or not
4  you recognize these merchant statements.
5     A.  Okay.
6     Q.  We have approximately about ten of merchant
7  statements.
8     A.  I'm sorry?
9     Q.  Ten months of merchant statements.
10    A.  Okay.
11    Q.  So there's ten statements.  On the first one --
12  this is kind of hard to see because we got these
13  documents through subpoena to EXS and Global Payment,
14  Incorporated, which is the company that printed out
15  statement and mailed to you.
16    A.  Oh, okay.
17    Q.  At the bottom, if you look at the bottom of
18  page 1 -- and when I say, "page 1," it's the Bates
19  numbers at the bottom.
20    A.  Okay.
21    Q.  So at the bottom of page 1, do you recognize
22  the name of Broadway Supermarket?
23    A.  Yes.
24    Q.  Do you recognize your name printed below

## 48

1  that?
2     A.  Yes.
3     Q.  And the address?  Would you tell us the
4  address.
5     A.  4879 North Broadway.
6     Q.  And that's the correct address of Broadway
7  Supermarket?
8     A.  Yes.
9     Q.  And this is addressed to you at Broadway
10  Supermarket, correct?
11    A.  Yes.
12    Q.  I recall earlier you testified you went through
13  these pages and that you gave to your accountant, Raymond
14  Tu, right?
15    A.  Yes.
16    Q.  And Raymond Tu, your accountant, has been with
17  you since 1996?
18    A.  Yes.
19    Q.  And that's when Broadway Supermarket was
20  opened?
21    A.  Yes.
22    Q.  So since the beginning?
23    A.  Yes.
24    Q.  So we're talking about, what, 14 years,

### 49

1  right?

2     A. Yes.

3     Q. Turn to page 34 of Exhibit A. Remember, the

4  page number I refer to is the number down here.

5     I'm going to ask you to read these statements

6  for the court reporter, and I realize you will not be

7  able to understand it.

8     MR. MA: Which page?

9     MR. DUCDUONG: 34. It's the Bates number.

10  BY MR. DUCDUONG:

11     Q. At the top of the second sentence -- actually,

12  the third sentence, it starts, "New mandates."

13     Could you read that sentence for us, please.

14     A. "New mandates, most often referenced as Payment

15  Card Industry Data Security Standards, have been enacted

16  in order to protect cardholder data, and the entire

17  credit card processing payment system, compliance with

18  PCI DSS and related state and federal mandates are your

19  responsibility."

20     Q. Did you understand that statement?

21     A. No.

22     Q. You understand that the Payment Card Industry

23  Data Security Standards have been enacted to provide

24  protection data, right? On this statement, do you

### 50

1  understand that, on that sentence?

2     A. What's your question?

3     Q. This sentence here that you just read.

4     A. You want me to read them again?

5     Q. Now, go to the next sentence. Could you read

6  that out loud for us, please, the next sentence.

7     "You are at risk."

8     A. "You are at risk for litigation, as well as

9  fines from the card associations, for any type of data

10  breach. In addition, the reputation of your business can

11  be placed at serious risk if it becomes publicly known

12  that your customers' card information credit card

13  merchant statement."

14     Q. Okay. Do you understand that sentence?

15     A. No.

16     Q. Is that your understanding of what they're

17  telling you?

18     A. This is at risk, but I don't know what risk.

19     Q. All right. But you understand what they're

20  telling you; you're at risk of being sued, that kind of

21  thing?

22     A. Do I -- you're saying that this is -- the

23  sentence will happen again?

24     Q. Yeah. Do you understand what you read?

### 51

1     A. To some extent.

2     Q. Okay. And I forgot to back up just a little

3  bit.

4     If you'd turn to page 32, at the bottom right

5  where it says the date of the statement, right here.

6     A. Oh, the date.

7     Q. And that would be December 31st, 2008, right?

8     A. Right.

9     Q. The reason I'm telling you this is because

10  Global statement that printed the monthly statement as

11  sent to you, they gave it to us not in the form that they

12  would have sent it to you. They gave us a continuous

13  from 4,000 pages. But if you set up monthly, you would

14  have received these on top of your page, and you would

15  have recognized it. But this is like entire four years

16  worth of monthly statements.

17     Now, I'd like you to turn back to page -- so

18  these are notices belonging to December 31st, 2008,

19  monthly statement; is that correct?

20     A. Yes.

21     Q. Okay. Now, can you turn to page 35. At the

22  top, it says, "Please help us."

23     Would you read that sentence out loud.

24     A. "Please help us assist you with your compliance

### 52

1  efforts by visiting our Web site www.compliancefacts.com.

2  This Web site provides helpful information about the

3  actions you may need to take."

4     Q. Okay. You understand that sentence?

5     A. Not fully. They ask you to visit the Web

6  site.

7     Q. Okay. Now, I'd like you to go to page 37.

8  This is also still December 31st, 2008, statement.

9     At the bottom of page 37, starting with,

10  "Please contact," would you read that whole paragraph.

11     A. "Please contact us if any of your credit card

12  terminal receipts include a complete credit card number

13  and/or expiration date as you may be in violation of

14  federal and/or state laws, and Visa/MasterCard rules.

15  Your terminal or POS system must meet these requirements.

16  Call 888-865-3248 and choose the technical support option

17  for assistance."

18     Q. Okay. Have you read this statement?

19     Do you understand what it tells you in the

20  first part of the sentence where it says about credit

21  card terminal receipt having credit card numbers and

22  expiration date; that that receipt would be in violation

23  of state and federal laws?

24     A. Yes.

## 53

1     Q.  Okay.  If you read it, you would understand
2 what it's telling you, right?
3     A.  Confusing is "and/or."  At the time, it's
4 number and expiration thing.
5     Q.  So if you had the credit card number and
6 expiration date on the receipt, you would be in violation
7 of state and/or federal law.  That's what it's telling
8 you.
9     A.  Yes.
10     Q.  And you would understand if you read it?
11     A.  Yes.
12     Q.  The next page I'd like you to go to is page 52.
13     On top of page 52 is the date of the statement,
14 February 27, 2009.
15     A.  Yes.
16     Q.  Would this be the February 2009 statement?
17     A.  Yes.
18     Q.  With your name and Broadway Supermarket,
19 right?
20     A.  Yes.
21     Q.  Now, in the middle where it says, "Information
22 Advice," would you read that sentence.
23     A.  "Receipts are properly truncated by visiting
24 our Web site at www.compliancefacts.com or call us

## 54

1 888-865-3248 and choose the technical support option for
2 assistance."
3     Q.  So this notice, this information advice,
4 basically, the same information you just read a few
5 minutes ago, right, look on the Web site and compliance?
6     Do you recall ever going to the Web site?
7     A.  No.
8     Q.  Did you ever call the 800 number?
9     A.  No.
10     Q.  Do you have access to the Internet?
11     A.  Not the Broadway, no.
12     Q.  Do you have computer at home that have access
13 to the Internet?
14     A.  Yes.
15     Q.  Did the store have a computer that have access
16 to the Internet?
17     A.  No.
18     Q.  What about Henry Thai, any of your brothers
19 working at the store?  Do they have access to the
20 Internet?
21     A.  No, not the Broadway Supermarket.
22     Q.  You don't know?
23     A.  (Witness nods.)
24     Q.  But you have access to the Internet at home

## 55

1 with your computer?
2     A.  Yes.
3     Q.  Right.  And you go online?
4     A.  I never use it.
5     Q.  Maybe once in a while, right?
6     A.  A long while.
7     Q.  Why didn't you call?
8     A.  I just didn't see this page.  I didn't see this
9 page.  I didn't know.
10     Q.  Okay.  Go to page 61.
11     Now, if you read the page before this, it show
12 you that this belong to March 31st, 2009, monthly
13 statement.
14     That would be the March 2009 statement; is that
15 correct?
16     A.  Yes.
17     Q.  Now, on page 61 in the middle of the page,
18 second paragraph where it says, "Learn how you can," do
19 you see that?
20     A.  Yes.
21     Q.  Okay.  Would you read that paragraph out loud.
22     A.  "Learn how you can maintain your PCI compliance
23 and ensure your receipts are properly truncated by
24 visiting our Web site at www.compliancefacts.com or call

## 56

1 us 888-865-3248 and choose the technical support options
2 for assistance."
3     Q.  Okay.  Did you read this statement when you
4 flipped through your monthly statements?
5     A.  No.
6     Q.  If you read it, would you understand it?
7     A.  Not completely, no.
8     Q.  Okay.  You know what they're telling you?
9     A.  I know they tell you to call, but what's the
10 reason?
11     Q.  Okay.  And they will tell you to either go to
12 the Web site or call us, meaning EXS, the credit card
13 processing company that you chose to process credit card
14 receipts at Broadway Supermarket, or you can go to the
15 Web site, right?
16     A.  Right.
17     Q.  Okay.  This is kind of tedious, but I'm going
18 to have you go through each of these statements.  They
19 basically have the same information, okay.
20     So we're going to page 67.  And the middle of
21 page 67 is the information regarding the statement.  And
22 it says April 30th, 2009.
23     A.  Oh, okay.
24     Q.  You see that?

## 57

1    A.  Yes.
2    Q.  This would be the April 2009 monthly statement;
3   is that correct?
4    A.  Yes.
5    Q.  Okay.  And toward the bottom of that page of
6   page 67, do you see your name on it and the address and
7   Broadway Supermarket as the addressee?
8    A.  Yes.
9    Q.  And that's the correct address?
10    A.  Yes.
11    Q.  And you received this monthly statement
12   sometime around April 30th, right?
13    A.  Yes.
14    Q.  Now, on page 84, this is the June 2009 monthly
15   statement.
16        You see right at the bottom, it says
17   June 30th, 2009?
18    A.  Yes.
19    Q.  This would be your June statement?
20    A.  Yes.
21    Q.  Is that correct?
22    A.  Yes.
23    Q.  Now, would you read this paragraph.
24    A.  Yes.

## 58

1        "Learn how you can maintain your PCI compliance
2   and ensure your receipts are properly truncated by
3   visiting our Web site at www.compliancefacts.com or call
4   us 888-682-4464 and choose option 1, then option 1 again,
5   for assistance."
6    Q.  Okay.  You understand what you read?  If you
7   read it, you would have understood what it's saying?
8    A.  Yes.
9    Q.  Okay.  I'm going to go out of order a little
10   bit.  We were talking about that Web site, right, or you
11   can call them, right?
12        This is Exhibit B.
13        (WHEREUPON, a certain document was marked
14         Exhibit B for identification as of
15         August 23, 2010, and is attached hereto.)
16    MR. MA:  She has testified that she never
17   went online.  I don't know why this was
18   introduced here as an exhibit, what kind of
19   questions you want to ask her.  Obviously, from
20   her testimony, she never seen this.
21        What do you want to say?
22    MR. DUCDUONG:  Well, we're going to ask
23   whether or not -- if she hasn't gone on the Web
24   site to look at it, if she did, she would have

## 59

1   seen this stuff.
2    MR. MA:  She did not.  She testified she did
3   not go to the Web site.  Right now, as to how she
4   would have reacted to this when -- had she gone
5   onto the Web site, I don't see -- that's
6   speculation.
7    MR. BURKE:  We're allowed to ask it.  I
8   mean, come on.
9    MR. MA:  Yeah, I have to object.
10    MR. BURKE:  Objection is finished.
11    MR. MA:  She testified she never went
12   online.  If you have this -- this is something
13   like, you know, speculation as to how she would
14   have reacted.  She never went online.
15    MR. BURKE:  Okay.  We understand your
16   objection, and we're entitled to ask whatever we
17   want as long as we're not being, you know --
18    MR. MA:  Basically, I would like the record
19   to reflect my objection that this -- given the
20   fact she has testified that she never went
21   online, this is not relevant.
22    MR. BURKE:  So it's a relevancy objection?
23    MR. MA:  Relevance and also speculation.  It
24   requires speculation.

## 60

1    MR. BURKE:  Okay.
2   BY MR. DUCDUONG:
3    Q.  At the bottom of this page, it's kinda hard to
4   see.  You see the Web site address?
5    A.  Yes.
6    Q.  Would you read out loud just the first part of
7   it, just the www.compliancefacts.com.
8        Would you read that out loud.
9    A.  www.compliancefacts.com.
10    Q.  Okay.  Now, this is the same Web site address
11   as the Web site address referred to on this page, on
12   page 84?
13        Is that the same Web site?
14    A.  Yes.
15    Q.  Would you turn to page 2 of Exhibit B.  I'd
16   like you to read what it's saying on the first paragraph
17   here and the two bullets.
18    A.  "The Fair and Accurate Credit Transaction Act
19   of 2003 (FACTA) sets a national standard requiring
20   truncation of credit card information.  FACTA states the
21   following: Credit and debit card receipts cannot include
22   more than the last five digits of the card number."
23        Second: "The card's expiration date cannot be
24   printed or displayed on your receipts."

## 61

1     Q.   Okay.  Do you understand what they're telling
2  you?  Do you have some general understanding?
3     A.   Some general.
4     Q.   Okay.  And if you read -- if you had gone to
5  the Web site and read, you know, what you just read, you
6  would understand?
7     A.   Not --
8     Q.   If you had gone to the Web site --
9     MR. MA:  Objection.  The question requires
10 speculation.  She didn't go online so ...
11 BY MR. DUCDUONG:
12    Q.   Okay.  All right.
13         If you had gone to the Web site and you check
14 out the Web site, you would have read and understand what
15 they're telling you; is that right?
16    MR. MA:  Objection.  Requires speculation.
17    MR. BURKE:  But you can still answer.
18 BY THE WITNESS:
19    A.   No, not completely.
20 BY MR. DUCDUONG:
21    Q.   Okay.  What part of it did you not
22 understand?
23    A.   This says receipt and five digits and
24 expiration date.  It doesn't say -- it is not clear.  I

## 62

1  don't understand what they're trying to ask about the
2  credit card receipt so I don't understand.
3     Q.   What would be your understanding of what you
4  just read?
5     A.   On the receipt can be five digits.
6     Q.   Okay.
7     A.   And the expiration date it can or can be there.
8  That's how my understanding.  I don't understand.
9     Q.   Right.  Well, on the second bullet, it says,
10 "The current expiration date cannot be printed or
11 displayed on your receipt."
12         Do you have some general understanding of what
13 they're telling you?
14    A.   Yes.  The expiration date.
15    Q.   What does it mean to you?
16    A.   The meaning, expiration cannot be printed or
17 displayed on your receipt.  That means it cannot print on
18 the receipt.
19    Q.   Okay.  All right.
20         The pictures on that same page as well -- look
21 at the pictures -- you understand when you look at the
22 pictures and tell you yes, no?  Like on the first
23 pictures, there was XXX on the card number and then XXX
24 for the expiration date?

## 63

1     A.   Yes.
2     Q.   If you look at the picture, you will understand
3  what the checkmark mean?  What do you think they're
4  telling you?
5     A.   I don't know.  I just saw XXX.
6     Q.   Right.  I'd like you to read the middle
7  paragraph starting with, "If either your merchant."
8     A.   "If either your merchant copy or customer copy
9  receipts improperly truncate the credit card number
10 and/or expiration date, as indicated by the samples to
11 the right, your processing solution will need to have its
12 software updated."
13    Q.   What do you think that paragraph means to you?
14    MR. MA:  Objection.  She read it.  The
15 paragraph means what it says.  Why do you want
16 her to explain it?
17         The paragraph -- she said the paragraph.  The
18 paragraph means what it says.
19 BY MR. DUCDUONG:
20    Q.   What does it mean to you?
21    A.   I don't quite understand.
22    Q.   Give me your general understanding of what you
23 just read.  Kinda put it in your own words.
24    A.   I don't understand the word "truncate."  I

## 64

1  don't understand the word "truncate."
2     Q.   Which part of it did you not understand?
3     A.   What do you mean by "improperly truncate the
4  credit card number"?
5     Q.   As indicated by the samples to the right.
6         Do you see that?
7     A.   Yes.
8     Q.   Meaning, this stuff here on the right.
9  Actually, it's on the left side.
10         This stuff here, right?  Is that right?
11    A.   Yes.
12    Q.   Just remember, if you shake your head, it
13 cannot -- you have to say something.
14    A.   Okay.
15    Q.   And the last sentence where it says, "Your
16 processing solution will need to have its software
17 updated," that's what you did; is that right?
18    A.   Yes.
19    Q.   Okay.  And you had Linus International update
20 your software remotely?
21    A.   Yes.
22    Q.   They didn't go to your store to update the
23 software?
24    A.   No.

---

### 65

1  Q.  And they did update the software?

2  A.  Yes.

3  Q.  Are you still now printing expiration date on

4  the receipt?

5  A.  No.

6  Q.  It got fixed?

7  A.  Yes.

8  Q.  On page 92 of Exhibit A, this would be your --

9  if you turn to the previous page, on top it would say

10 July 31st, 2009.  Turn to page 91.

11      Okay.  You see the date July 31st, 2009?

12 A.  Yes.

13 Q.  This would be your July 2009 statement; is that

14 right?

15 A.  Yes.

16 Q.  Okay.  So you go to the next page, page 92,

17 right in the middle.

18 A.  Okay.

19 Q.  Would you read that out loud.

20 A.  "Learn how you can maintain your PCI compliance

21 and ensure your receipts are properly truncated by

22 visiting our Web site at www.compliancefacts.com or call

23 us 888-682-4464 and choose option 1, then option 1 again,

24 for assistance."

---

### 66

1  Q.  Basically, this is the same paragraph that were

2  printed in earlier monthly statements, right?

3  A.  Yes.

4  Q.  Okay.  Now I'd like you to go to page 100.  If

5  you go to the previous page, you will see that this is an

6  August 2009 statement.

7  A.  Yes.

8  Q.  So this will be your August 2009 statement; is

9  that right?

10 A.  Yes.

11 Q.  Okay.  At the bottom of page 100 where it

12 starts with "PCI Compliance," would you read that

13 statement, the paragraph.

14 A.  "Learn how you can maintain your PCI compliance

15 and ensure your receipts are properly truncated by

16 visiting our Web site at www.compliancefacts.com or call

17 us 888-682-4464 and choose option 1, then option 1 again,

18 for assistance."

19 Q.  This is the same paragraph that was printed in

20 the previous statements; is that right?

21 A.  Yes.

22 Q.  And it tell you to go to the Web site or call

23 the 800 number -- the toll-free number, right?

24 A.  Yes.

---

### 67

1  Q.  The next page is 107.  In the previous page,

2  page 106, in the middle it tell you the date of the

3  statement.

4      It would be your September 2009 monthly

5  statement; is that right?

6  A.  Right.

7  Q.  On the next page, page 107, toward the bottom

8  with "PCI Compliance," will you read that paragraph.

9      MR. MA:  How about we do this:  We stipulate

10 that --

11     MR. DUCDUONG:  We're almost done.

12     MR. BURKE:  What do you want to stipulate

13 to?

14     MR. MA:  We'll stipulate that the

15 statements, you don't need her to ask her to read

16 each statement one by one.  If you do that, it

17 would take days.  Stipulate that it is printed

18 over there.

19     MR. BURKE:  And that these are -- the

20 information on these statements is the

21 information that was sent from EXS --

22     MR. MA:  If they're printed or there's

23 nothing we can do.  It's printed.  You don't need

24 to ask her to read each and every one of them.

---

### 68

1      MR. BURKE:  So all of Exhibit A was received

2  by the Defendant?

3      MR. MA:  No.  I say you don't need to -- on

4  your exhibits, it is printed over there.  The

5  language is printed over there.  And you don't

6  need to have her read every -- the same paragraph

7  tells you the same thing.

8      We cannot stipulate that they are received.

9  Just on your exhibit, that each monthly statement

10 contains such a statement.

11     MR. DUCDUONG:  Are you stipulating that

12 Exhibit A, the entire Exhibit A, reflects

13 accurately --

14     MR. MA:  Your exhibit, your exhibit.

15     MR. DUCDUONG:  Well, I would like your

16 client --

17     MR. BURKE:  We're laying a foundation here.

18 We're willing to make some reasonable

19 stipulations, but what you're suggesting, that we

20 just agree that this is an exhibit, that's not

21 good enough.

22     If you want to agree that these are the monthly

23 statements and that the Defendant received them, that's

24 something.  But if you just want to stipulate that this

69

1    is an exhibit, there's no substance to that.
2        So if you want to suggest a reasonable
3    stipulation --
4        MR. MA:  That is.  Just save us some time.
5    Just stipulate that the statements contained
6    on -- every statement in your exhibit.  We cannot
7    stipulate whether she received it at this time
8    yet.
9            How about that?  So that we don't have her to
10   read each and every statement.
11       MR. DUCDUONG:  Well, I would like --
12       MR. MA:  Unless you have something different
13   each month.
14       MR. DUCDUONG:  Well, we do have something
15   each month.  It's just that this month have the
16   same notices.  On each of these statement, her
17   name's on it, Lana Thai, along with Broadway
18   Supermarket on the address.
19           If you're willing to stipulate that all these
20   statements were received --
21       MR. MA:  I cannot stipulate to that effect.
22   I can stipulate on your exhibit, her name was
23   printed, the statement you asked her to read, you
24   know, were printed on the statements, each

70

1    statement, unless you have something different,
2    so that she does not need to read each and every
3    one of them.
4            How about that?
5    BY MR. DUCDUONG:
6        Q.  Do you have any reason to believe that any of
7    the information on Exhibit A do not accurately reflect
8    the statement that Broadway Supermarket received?
9        MR. MA:  You're asking me?
10       MR. DUCDUONG:  Her.
11   BY MR. DUCDUONG:
12       Q.  These statement you have gone through so far,
13   do you have any reason to believe that this Exhibit A
14   containing these monthly statements do not accurately
15   reflect what you receive from Electronic Exchange
16   System?
17       A.  I do not recall every single one of them.  I
18   don't know if it's exactly the same number and things.  I
19   don't know.  I cannot memorize all of this.
20       Q.  Okay.  Do you have any reason to believe that
21   these contain inaccurate information?
22       A.  I cannot say no, I cannot say yes, because I
23   don't recall all of them.
24       Q.  Now, you said earlier that these statements

71

1    were sent to Broadway Supermarket at the correct address
2        A.  Yes.  You're asking me each figure.  I cannot
3    recall each individual detail.  I don't know.
4        Q.  Okay.  And you testified earlier that you
5    receive monthly statement toward the end of the month; is
6    that right?
7        A.  Yes.
8        Q.  Every month?
9        A.  I believe so.
10       Q.  Okay.  And you flipped through it, and you gave
11   to your accountant?
12       A.  Yes.
13       Q.  Raymond Tu?
14       A.  Yes.
15       Q.  To do the accounting work, right?
16       A.  Yes.
17       Q.  But you do make sure that you got these
18   statements?
19       A.  Right.  I just make sure I got the statement
20   and gave it to him.
21       Q.  So what I'm going to do is go through the
22   statement -- we're almost done, there's only a few
23   more -- and I'm going to ask you to tell us whether or
24   not it contains any inaccurate information that says your

72

1    name, address and what was printed on it.
2        A.  Okay.
3        Q.  Let's go to page 117.  This would be your
4    October 2009 statement; is that right?
5        A.  Yes.
6        Q.  Yes?
7        A.  Yes.
8        Q.  Turn to the next page, page 18.  It says -- at
9    the bottom where it says, "Truncate your receipts," was
10   this the same information that you received that you read
11   in the earlier statements this paragraph?
12       A.  Yes.
13       Q.  It's the same information that they provided to
14   you in other statements -- in other monthly statements;
15   is that right?
16       A.  Yes.
17       Q.  And do you believe that this statement
18   contained different information from what you would have
19   received from Electronic Exchange?
20       A.  Every detail, I don't know, but it's
21   familiar.
22       Q.  Do you have any reason to believe that this
23   paragraph is different from what you would receive from
24   Electronic Exchange?

## 73

1    A.  I did not read the one I received so I don't
2    know.
3    Q.  What about the rest of them that you have gone
4    through so far, the other statement that we have gone
5    through since August 2008?
6    A.  What's your question?
7    Q.  We went through -- remember, we went through a
8    number of these monthly statements?
9    A.  Yes.
10    Q.  Right.  Do you have any reason to believe that
11    the monthly statements we have just gone through contain
12    inaccurate information?
13    A.  I don't know.  I don't know.
14    Q.  Okay.
15    A.  When you say in every, I don't know what's your
16    meaning of being accurate?  The numbers or letters?
17        I have told you, I did not read through the
18    letters.  The numbers, I cannot memorize.
19    Q.  You don't know the details?
20    A.  Right.  I don't know the detail.
21    Q.  Okay.  But you said earlier -- you testified
22    earlier that you have gone through these statements when
23    you receive it quickly, right?
24    A.  Right.

## 74

1    Q.  You flip through it?
2    A.  Right.
3    Q.  Do they look like what you received?
4    A.  Yes.
5    Q.  In format?
6    A.  Right.
7    Q.  So you're familiar with it?
8    A.  Yes.
9    Q.  It look like exactly what you have received
10    from Electronic Exchange Systems?
11    A.  Yes.
12    Q.  Okay.  Did you recall ever not receiving any
13    monthly statements?  Did they ever miss a month or two
14    months?
15    A.  Sometimes.  I believe it miss by mail.
16    Q.  What would you do if you don't receive, let's
17    say, this month's monthly statement?  Did you call them
18    and say, hey, where is my monthly statement?
19    A.  No.
20    Q.  Did you ever -- do you recall ever not
21    receiving a monthly statement?
22    A.  To my best knowledge, I don't remember.  I
23    don't recall.
24    Q.  So every month the same, just like clockwork?

## 75

1    A.  Yes.
2    Q.  You receive every single month.  You went
3    through it quickly?
4    A.  Yes.
5    Q.  And then you gave to your accountant,
6    Raymond Tu?
7    A.  Yes.
8    Q.  And it sent to the correct address?
9    A.  Yes.  4879.
10    Q.  4879 North Broadway; is that right?
11    A.  Yes.
12    Q.  Now I want to go to page 141.  Actually 140,
13    the page before that.
14        This would be your December 2009 statement; is
15    that right?  If you look in the middle right here.
16    A.  Oh.  Yes, December 31st.
17    Q.  And that's your -- that Broadway Supermarket as
18    the addressee; is that right?
19    A.  The address, yes.
20    Q.  And that's your name on it?
21    A.  Yes.
22    Q.  And that's the correct address?
23    A.  Yes.
24    Q.  And you received this December '09 statement?

## 76

1    A.  Yes.
2    Q.  Turn to page 142.  This contain the same
3    paragraph that you read earlier.  At the bottom of page
4    142, where it says, "Information Advice," do you see
5    that?
6    A.  Uh-huh.
7    Q.  Page 142, "Information Advice."  You see that
8    paragraph?
9    A.  Yeah.
10    Q.  Okay.  Now, read the paragraph.
11        Do you recognize this is the same paragraph
12    that has been printed in other statements?
13    A.  "Please visit our Web site at
14    www.compliancefacts.com for complete details on this
15    program and to use the resources we have made available.
16    If you have any questions, please contact us at the
17    customer service number provided on your statement."
18    Q.  Okay.  This is exactly the same paragraph that
19    were printed in other statements, right?
20    A.  Yes.
21    Q.  Now, tell us:  When did you have Linus fix the
22    software or update the software after the lawsuit?
23        When was it?
24    A.  The lawsuit sent in, and then we called Linus

77

1   and Linus did it.
2       Q.  Do you remember the approximate date or maybe
3   month?
4       A.  Right after we received --
5       Q.  A few weeks after the lawsuit was filed?
6       A.  About two or three days.
7       Q.  Two days, three days?
8       A.  I cannot say.
9       Q.  Fairly short time?
10      A.  Fairly short time.
11      Q.  Within a week or so?
12      A.  Within a week.
13      Q.  And Linus update the software remotely?
14      A.  Yes.
15      Q.  From their office?
16      A.  Yes.
17      Q.  And when you check the receipt after Linus
18  updated the software, did you see the expiration date
19  printed on the receipt?
20      A.  No.
21      Q.  So now you learned that there was no receipt
22  with the expiration date on it?
23      A.  Yes.
24      Q.  Because Linus updated the software?

78

1       A.  Yes.
2       Q.  Right.  Now, I'd like to refer you to page 34,
3   I believe.
4       MR. MA:  134 or 34?
5       MR. DUCDUONG:  34.
6   BY MR. DUCDUONG:
7       Q.  This is the December 2008 statement.  Do you
8   recognize it?
9           If you turn to the previous page, you will see
10  that as well on page 32 printed as your --
11      MR. MA:  34, there is a date.
12      MR. DUCDUONG:  Actually 33, where it print
13  your name, address, and it will tell you the
14  statement.
15          Oh, I'm sorry.  Actually, start at page 30 for
16  the December '08 statement toward the bottom.  At the
17  bottom where it says credit card merchant statement and
18  the date.
19  BY MR. DUCDUONG:
20      Q.  So this would be your December 2008 statement
21  is that right?
22      A.  Yes.
23      Q.  Now, on page 34 -- and we are still on the
24  December 2008 statement.

79

1           Right in the middle, second paragraph, where it
2   says, "You are at risk for litigation."
3       MR. MA:  Objection.  This was asked and
4   answered already.  This was asked and answered.
5       MR. DUCDUONG:  Well, I haven't finished my
6   question.
7       MR. MA:  Go ahead.
8       MR. DUCDUONG:  Thank you.
9   BY MR. DUCDUONG:
10      Q.  It's saying you are at risk for litigation.
11          Now, if you had read these statements, what
12  would you do?
13      MR. MA:  Objection; asked and answered.
14      MR. DUCDUONG:  I don't think she answered
15  the question.
16      MR. BURKE:  Go ahead and answer, please.
17  BY THE WITNESS:
18      A.  What was the question?
19  BY MR. DUCDUONG:
20      Q.  What would you do if it would tell you that
21  you're at risk of litigation, lawsuits, if you print
22  expiration date, credit card numbers on the receipt?
23          What would you do if you have read it?
24      MR. MA:  Objection.  The paragraph you read,

80

1   it did not say that.
2       MR. BURKE:  Why don't you rephrase the
3   question.
4           We're going to take 30 seconds outside.
5           (Pause in the proceedings.)
6   BY MR. DUCDUONG:
7       Q.  You received this statement, is that correct,
8   this December 2008 statement?
9       A.  Yes.
10      Q.  Do you recall receiving this statement?
11      A.  (Witness nods.)
12      Q.  Okay.  You gotta say because -- is that yes?
13      A.  Yes.
14      Q.  If you have read the paragraph, what would
15  you do?
16      MR. MA:  Objection.  It was asked and
17  answered.
18      MR. DUCDUONG:  I'm asking the Defendant
19  to -- if she had read the statement --
20      MR. MA:  You previously asked her the same
21  question.  She answered.
22      MR. DUCDUONG:  She hasn't answered the
23  question.
24          Go ahead.

---

## 81

1  BY THE WITNESS:
2      A.  To my limitation understanding, I would -- I
3  don't know.
4  BY MR. DUCDUONG:
5      Q.  What would you do?
6      A.  I would -- if I have read, I would go to a
7  professional and ask what do that mean.
8      Q.  Say that out loud.
9      A.  I would go to a professional and ask what that
10  mean, but I don't have -- I don't have no knowledge of
11  that.
12      Q.  Okay.  And we were talking about this
13  paragraph; is that right?  The first sentence there where
14  it says, "You are at risk for litigation, as well as
15  fines from the card associations, for any type of data
16  breach."
17      MR. BURKE:  Do you mind if I ask some
18  questions?
19      MR. MA:  No, go ahead.
20      MR. BURKE:  May I?
21      MR. DUCDUONG:  Yeah.
22          FURTHER EXAMINATION
23  BY MR. BURKE:
24      Q.  Okay.  I think we've established that

---

## 82

1  Broadway Supermarket received the statement on pages 33
2  and 34 of Exhibit A, right?
3      A.  Yes.
4      Q.  Okay.  And what we're trying to figure out
5  is -- and I think we also established that you didn't
6  read the text on page 34; is that right?
7      A.  Yes.
8      Q.  Okay.  Had you read the paragraph that begins
9  at, "You are at risk for litigation," what would you have
10  done?
11      A.  At the time, I don't think I'm at risk.  I
12  don't know I have involved in any litigation because I
13  didn't do anything wrong with anybody's credit card
14  so ...
15      Q.  So had you received this warning, "You are at
16  risk for litigation," you would not have done anything;
17  is that correct?
18      A.  You're saying if I got a warning, yes, I will
19  go and ask the professional, like I said, but I don't
20  know I'm at risk of anything.
21      Q.  So you wouldn't take this paragraph as a
22  warning that if it becomes publicly known that your
23  customers' credit card information has been
24  compromised --

---

## 83

1      A.  I don't understand your question.
2      Q.  Well, I would characterize this paragraph as a
3  warning to Broadway Supermarket that it's at risk for
4  litigation concerning its customers' credit card
5  information being compromised.
6      Would you agree?
7      A.  I don't know.  I don't understand.
8      Q.  What don't you understand?
9      A.  Because they say you're at risk.  I don't
10  understand what I'm in risk of.
11      Q.  So maybe had you read this, I think you
12  testified earlier, you might have called a professional;
13  is that right?
14      A.  Yes.
15      Q.  But you didn't read it so you didn't call a
16  professional; is that right?
17      A.  Yes.
18      Q.  Would you say that it might have been a little
19  bit reckless for you not to have read mail --
20      MR. MA:  Objection, objection.
21      MR. BURKE:  Do not interrupt.
22      MR. MA:  Don't use the word "reckless."
23      MR. BURKE:  Do not interrupt me.
24      MR. MA:  I have to object.

---

## 84

1      MR. BURKE:  You are out of line here.  You
2  may not object in the middle of my questioning.
3      MR. MA:  You want to terminate the
4  deposition?  You want to terminate the
5  deposition?  I have to object.
6      MR. BURKE:  You may not interrupt me in the
7  middle of my question.  The proper procedure --
8  you're doing it again.
9      MR. MA:  You are stating characterization of
10  your position.
11      MR. BURKE:  I'm allowed to do that.
12      MR. MA:  No.  You're asking questions of
13  fact.  You're not arguing with my client.
14      MR. BURKE:  I am certainly permitted to ask
15  the question that I began, and if you want to end
16  this deposition, you may.
17      State your objection right now.
18      MR. MA:  You want to prevent me from raising
19  my objections.
20      MR. BURKE:  You interrupted me in the middle
21  of my question.  In no venue is that appropriate
22  ever.
23      MR. MA:  But that's appropriate to raise
24  objection because you raise the reckless --

## 85

1  you're trying to argue with my client. You're
2  trying to trick my client.
3        MR. BURKE: You either permit this question
4  to go forward or you end the deposition.
5        MR. MA: I object to the question. I object
6  to the form of the question. I don't want to
7  terminate the -- end this deposition.
8        You know, I want to raise my objections to your
9  question, the form of your question.
10       MR. BURKE: Say the objections without
11 coaching your witness.
12       MR. MA: No, I did not.
13       MR. BURKE: Are you finished with the
14 objection?
15       MR. MA: Yes.
16       MR. BURKE: All right. Your objection is
17 noted. That's fine.
18       MR. MA: Okay.
19 BY MR. BURKE:
20       Q.  We were talking about reading your mail,
21 right?
22       A.  Yes.
23       Q.  And you testified earlier that you don't read
24 the mail that Broadway Supermarket receives from its

## 86

1  credit card processing company except for the first page;
2  is that correct?
3        A.  Yes.
4        Q.  Is there anyone else at Broadway Supermarket
5  who reads the mail that is received regarding credit card
6  processing?
7        A.  No.
8        Q.  Would you say that it is reckless -- objection
9  noted -- to not read the mail, including warnings that
10 you're at risk for litigation?
11       MR. MA: Objection.
12       MR. BURKE: Objection noted.
13       MR. MA: It requires an opinion. Objection.
14       MR. BURKE: Would you read the question
15 again.
16       (Record read as requested.)
17 BY THE WITNESS:
18       A.  Can you try to explain it more. I don't
19 understand.
20 BY MR. BURKE:
21       Q.  I'll ask it in a different way.
22       Do you wish that you had read this mail when it
23 came in?
24       A.  Yes.

## 87

1        Q.  Completely?
2        A.  Yes.
3        Q.  What would you had done had you read this mail
4  completely?
5        A.  I would seek advice to help me.
6        Q.  Do you think that it was reckless for you to
7  not have read the entire piece of mail?
8        MR. MA: Objection. The same objection.
9  BY MR. BURKE:
10       Q.  You can answer.
11       A.  Say that again. Sorry.
12       (Record read as requested.)
13       A.  Yes.
14 BY THE WITNESS:
15       MR. BURKE: Five-minute break, please.
16       (Recess was taken.)
17 BY MR. BURKE:
18       Q.  Did you work on responding to discovery in
19 this case?
20       A.  What does that mean?
21       Q.  Probably at some point, your lawyer asked
22 you -- asked Broadway Supermarket -- and I don't want to
23 know what you said to each other, but at some point he
24 probably asked you to gather documents regarding the

## 88

1  case.
2        Did that ever happen?
3        A.  Not directly to me.
4        Q.  Okay. Who worked on gathering documents for
5  this case? Do you know?
6        A.  To put them -- put what you request?
7        Q.  Right. Put together documents regarding the
8  case.
9        MR. DUCDUONG: Papers, you know, these
10 monthly statements or that stuff.
11       MR. MA: This I have to stick to one person
12 asking questions.
13 BY MR. BURKE:
14       Q.  You don't know?
15       A.  I don't know what you're trying to ask me.
16       Q.  So part of every lawsuit is that the parties
17 exchange information and documents, okay, documents like
18 pieces of paper such as Exhibit D. This document was
19 provided to us through your lawyers -- through Broadway
20 Supermarket's lawyers, okay?
21       A.  Okay.
22       Q.  Did you help locate Exhibit D?
23       A.  I call -- when the lawyer talk to Henry and
24 then Henry let me know, I just called Khalid to fax the

---

89

1  information over.
2      Q.  Did Henry ever ask you to locate any credit
3  card documents?
4      A.  He said he would need some receipts of the
5  credit card.
6      Q.  Did he ask for anything else?
7      A.  That's all he was asking.
8      Q.  Are there any more credit card contracts that
9  Broadway Supermarket has in its offices other than
10  Exhibit D?
11     A.  I don't have them because it was destroyed by
12  the fire.
13     Q.  Does the accountant have copies of that
14  stuff?
15     A.  No.
16     Q.  So Exhibit D is the only credit card contract
17  since the fire?
18     A.  This copy I ask to fax to us.
19     Q.  So this was faxed recently from the CPA?
20     A.  No.  From Khalid.
21     MR. BURKE:  Okay.  That's all we have for
22  this witness.
23     MR. MA:  I have a couple of questions.
24             EXAMINATION

---

90

1  BY MR. MA:
2      Q.  They asked you repeatedly about this paragraph,
3  "You are at risk of litigation," and they mentioned any
4  type of data breach.
5          Without this lawsuit, if prior to the filing of
6  this lawsuit, if you read -- you had read this paragraph,
7  would you have thought that you are at risk of
8  litigation?  Prior to this lawsuit, I mean.
9      A.  No.
10     Q.  Each month you receive a statement from this
11  EXS; for instance, this one.
12         How far you would have read this statement into
13  the statement, the first page?
14     MR. DUCDUONG:  If I may, Mr. Ma, would you
15  please refer to the page number.
16     MR. MA:  I said the first page of this
17  Exhibit A.
18     MR. DUCDUONG:  Okay.
19  BY THE WITNESS:
20     A.  I look through my store name and my account
21  number.  If it's pretty much right, then okay.
22  BY MR. MA:
23     Q.  Okay.  Before you receive this lawsuit, were
24  you aware that there might be a possibility that the --

---

91

1  for instance, before this lawsuit, were you aware that
2  there was a possibility that your customers' credit card
3  information might be compromised?
4      Were you aware of that before the filing of
5  the lawsuit?
6      A.  No.
7      MR. MA:  I have no further questions.  Oh,
8  another question.
9  BY MR. MA:
10     Q.  After the filing of this lawsuit, you do not
11  contact -- you did not contact outside people, for
12  instance, contact my office.  Always your brother Henry
13  contacted the lawyers; is that correct?
14     A.  Yes.
15     Q.  Okay.  And then whatever information required,
16  that should be transmitted to you -- the request would be
17  transmitted from Henry to you, right?
18     A.  Yes.
19     MR. MA:  I have no further questions.
20     MR. BURKE:  I have a couple follow-ups from
21  that.
22             FURTHER EXAMINATION
23  BY MR. BURKE:
24     Q.  Directing your attention to Exhibit A, page 1,

---

92

1  you see where it says, "Other Fees," and then under that
2  it says, "Number"?
3      Do you see that?
4      A.  Yes.
5      Q.  Do you see those numbers?
6      A.  This number?  I see this number, yes.
7      Q.  Okay.  Would it be accurate to say that the
8  monthly statements, including Exhibit A, page 1, under
9  that column "Number," state the number of credit card
10  transactions for that month -- the previous month?
11     A.  I don't understand your question.
12     Q.  In the column where it says, "Number," the
13  first number is 1 for Amex, the second is 257 for
14  Discover, the third is 1,891 for Visa, and the fourth is
15  1,378 for MasterCard; is that correct?
16     A.  I don't recall.  I don't know.
17     Q.  Is that what the document says?
18     A.  This document?
19     Q.  Yes.
20     A.  Yes, that's what it says.
21     Q.  Okay.  Do those numbers correspond to the
22  number of credit card transactions for the previous
23  period, according to EXS?
24     A.  I don't know.

## 93

1    Q.   Who would know that?

2    A.   I don't quite understand this.

3    Q.   You understand that Broadway Supermarket takes

4    credit cards for some purchases, right?

5    A.   Yes.

6    Q.   And that each month there are a certain number

7    of purchases for each type of credit card that it takes,

8    right?

9    A.   Yes.

10   Q.   So, like, sometimes there might be 20

11   American Express transactions in a month, right?

12   A.   Yes.

13   Q.   And maybe another month there are 1,000

14   MasterCard transactions; is that right?

15   A.   Yes.

16   Q.   What I'm trying to learn is whether these

17   numbers on Exhibit A, page 1, correspond to the number

18   of credit card transactions for the previous month.

19        Would that be a correct statement to say that

20   these numbers correspond to the number of credit card

21   transactions?

22   A.   We don't count so I don't know.  Whatever the

23   company print.  I don't know.

24   Q.   Okay.  So whatever EXS tells you, you believe

## 94

1    is true, right, as far as the number of transactions?

2    A.   Yes.

3    Q.   Okay.  So would it be accurate to say that in

4    this particular month, there were 1,891 Visa

5    transactions, according to EXS?  Would that be correct?

6    A.   Asking me, I don't know.

7    Q.   You're the only person that reads this stuff

8    for Broadway Supermarket, right?

9    A.   Right.  But I don't have -- I don't have time

10   to count each one of them.

11   Q.   Do you believe that these numbers are correct

12   that EXS gave to Broadway Supermarket?

13   A.   I'm sorry; I don't know.

14   Q.   You don't know if they're correct or you don't

15   know what they mean?

16   A.   I don't know.

17   Q.   So you don't know what those numbers mean?

18   A.   Not -- no.

19   Q.   So those credit card transaction numbers aren't

20   part of what you review when you open the mail; is that

21   correct?

22   A.   Yes, I don't go through that.  I just look to

23   see if it's my account and Broadway Supermarket.  Quickly

24   see through it.

## 95

1    Q.   That's all you look for?

2    A.   Yeah.

3    Q.   And then you forward it to the accountant

4    either that month or, like, within a few months, right?

5    A.   Yes.

6    Q.   And no one else reads any of the mail?

7    A.   No.

8    Q.   That's right?

9    A.   Yes.

10   Q.   We understand that in discovery in this case,

11   it's been estimated that Broadway Supermarket over the

12   two years before the lawsuit was filed had between 9,000

13   and 14,000 receipts with the expiration date on them that

14   were given to the consumer.

15        Do you think that this is a reasonable number

16   based on your understanding of the number of transactions

17   that Broadway Supermarket does?

18   A.   I don't know.

19   Q.   Who would know?

20   A.   We didn't recall so -- because I'm the one who

21   doing it.  I did not know the account, how many comes in

22   or how many we receive each month.  I don't know.

23   Q.   So nobody --

24   A.   Because a lot of stuff to do.  We don't go

## 96

1    through each detail of each transaction.  We don't.  We

2    don't have time for that.  We only do what is right and

3    stuff like that.

4         Sometimes stuff like this, we are not very --

5    we don't understand.  We don't comprehend very well like

6    you lawyers are.  We are just average person so I'm sorry

7    if this is the case.  I did not.  I have no intention at

8    all.  If I know this was so, I wouldn't do anything like

9    this to harm other people.  Sorry.

10   Q.   Is there anyone else at Broadway Supermarket

11   that corresponds with the CPA, accountant, other than

12   you?

13   A.   Not really.

14   Q.   No?

15   A.   No.

16   Q.   Do you know if anyone else asks the CPA or the

17   accountant for documents relating to the credit card

18   processing?

19   A.   No.

20   Q.   You don't know or they did not?

21   A.   They did not.

22   MR. BURKE:  Okay.  That's all.

23   MR. MA:  Signature reserved.

24        (Proceedings adjourned at 1:50 p.m.)

97

1  STATE OF ILLINOIS )
2                    ) SS:
3  COUNTY OF COOK   )
4       I, Lisa S. Schwam, a Notary Public within and
5  for the County of Cook, State of Illinois, and a
6  Certified Shorthand Reporter, Registered Professional
7  Reporter, and Certified Realtime Reporter, do hereby
8  certify:
9       That previous to the commencement of the examination
10 of the witness, the witness was duly sworn to testify the
11 whole truth concerning the matters herein;
12      That the foregoing deposition transcript was
13 reported stenographically by me, was thereafter reduced
14 to typewriting under my personal direction and
15 constitutes a true record of the testimony given and the
16 proceedings had;
17      That the said deposition was taken before me at the
18 time and place specified;
19      That I am not a relative or employee or attorney or
20 counsel, nor a relative or employee of such attorney or
21 counsel for any of the parties hereto, nor interested
22 directly or indirectly in the outcome of this action.
23      IN WITNESS THEREOF, I do hereunto set my hand of
24 office at Chicago, Illinois, this 7th day of September,

99

1              I N D E X
2  WITNESS                    EXAMINATION
3  LANA THAI
4     By Mr. Burke          6, 81, 91
5     By Mr. DucDuong             38
6     By Mr. Ma                   89
7          E X H I B I T S
8  NUMBER                        PAGE
9  Lana Thai Deposition Exhibits
10    Exhibit A               46
11    Exhibit B               58
12    Exhibits C-1 & C-2          44
13    Exhibit D               38
14    Exhibit E                7
15
16
17
18
19
20
21
22
23
24

98

1  2010.
2
3
4             Notary Public, Cook
5             County, Illinois.
6             My commission expires July 9, 2011
7
8  CSR No. 84-004650
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

100

1             DEPOSITION ERRATA SHEET
2
3
4  Assignment No. 167425
5  Case Caption: Drager vs. Broadway Supermarket
6
7       DECLARATION UNDER PENALTY OF PERJURY
8       I declare under penalty of perjury
9  that I have read the entire transcript of
10 my Deposition taken in the captioned matter
11 or the same has been read to me, and
12 the same is true and accurate, save and
13 except for changes and/or corrections, if
14 any, as indicated by me on the DEPOSITION
15 ERRATA SHEET hereof, with the understanding
16 that I offer these changes as if still under
17 oath.
18      Signed on the _____ day of
19 _____, 20___.
20
21 _____
22      LANA THAI
23
24

101

1              DEPOSITION ERRATA SHEET
2        Page No._____Line No._____Change to:_____
3        _____
4        Reason for change:_____
5        Page No._____Line No._____Change to:_____
6        _____
7        Reason for change:_____
8        Page No._____Line No._____Change to:_____
9        _____
10       Reason for change:_____
11       Page No._____Line No._____Change to:_____
12       _____
13       Reason for change:_____
14       Page No._____Line No._____Change to:_____
15       _____
16       Reason for change:_____
17       Page No._____Line No._____Change to:_____
18       _____
19       Reason for change:_____
20       Page No._____Line No._____Change to:_____
21       _____
22       Reason for change:_____
23       SIGNATURE:_____DATE:_____
24            LANA THAI

102

1              DEPOSITION ERRATA SHEET
2        Page No._____Line No._____Change to:_____
3        _____
4        Reason for change:_____
5        Page No._____Line No._____Change to:_____
6        _____
7        Reason for change:_____
8        Page No._____Line No._____Change to:_____
9        _____
10       Reason for change:_____
11       Page No._____Line No._____Change to:_____
12       _____
13       Reason for change:_____
14       Page No._____Line No._____Change to:_____
15       _____
16       Reason for change:_____
17       Page No._____Line No._____Change to:_____
18       _____
19       Reason for change:_____
20       Page No._____Line No._____Change to:_____
21       _____
22       Reason for change:_____
23       SIGNATURE:_____DATE:_____
24            LANA THAI

# Exhibit B













# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| HANK DRAGER and THOMAS LE, on behalf of themselves and all others similarly situated, | ) **CLASS ACTION** |
| | ) |
| | ) |
| Plaintiffs, | ) Case No.: 1:09-cv-6481 |
| | ) |
| vs. | ) Judge Hart |
| | ) |
| BROADWAY SUPERMARKET, an Illinois corporation, | ) Magistrate Judge Brown |
| | ) |
| Defendant. | ) |

## DECLARATION OF ALEXANDER H. BURKE

I am Alexander H. Burke, manager of Burke Law Offices, LLC.

In September 2008, I opened Burke Law Offices, LLC. This firm concentrates on consumer class action and consumer work on the plaintiff side. Since the firm began, it has prosecuted cases for consumers under the Fair Debt Collection Practices Act, Fair Credit Reporting Act, Equal Credit Opportunity Act, Illinois Consumer Fraud Act, Truth in Lending Act and the Fair Labor Standards Act, among others. The firm also occasionally accepts mortgage foreclosure defense or credit card defense case. Except for debt collection defense cases, the firm works almost exclusively on a contingency basis.

My legal career began at Edelman, Combs, Latturner & Goodwin, LLC, in Chicago, Illinois, where I spent nearly three years litigating exclusively consumer cases. I estimate that approximately sixty-five percent of those cases were class actions. In 2007, I joined the Law Offices of Keith J. Keogh, Ltd., another consumer rights law firm, where my practice was again limited almost exclusively to consumer class action.

I make substantial efforts to remain current on the law, including class action issues. I attended the National Consumer Law Center Consumer Rights Litigation Conference in 2006, 2007, 2008 and 2009, and was an active participant in the Consumer Class Action Intensive Symposium at each of those conferences. In October 2009, I spoke on a panel of consumer class action attorneys welcoming newcomers to the conference. In addition to regularly attending Chicago Bar Association meetings and events, I am the chair of the Chicago Bar Association's consumer protection section, and in November 2009, I moderated a panel of judges and attorneys discussing recent events and decisions concerning arbitration of consumer claims and class action bans in consumer contracts. In November 2010, I spoke at the National Association of Elder Law Attorneys national conference, regarding consumer law issues.

Some notable class actions that I have worked on include:

*Greene v. DirecTV, Inc.,* 2010 WL 1506730 (N.D.Ill. April 14, 2010) (motion to dismiss denied as to class TCPA and FCRA claims); *Donnelly v. NCO Financial Systems, Inc.,* 263 F.R.D. 500 (N.D.Ill. Dec. 16, 2009) Fed.R.Civ.P. 72 objections overruled in toto, --- F.Supp.2d ----, 2010 WL 308975 (N.D.Ill. Jan 13, 2010) (novel class action and TCPA discovery issues decided favorably to class); *Cicilline v. Jewel Food Stores, Inc.,* 542 F.Supp.2d 831 (N.D.Ill. 2008) (FCRA class certification granted); 542 F.Supp.2d 842 (N.D.Ill. 2008) (plaintiffs' motion for judgment on pleadings granted); *Harris v. Best Buy Co.,* 07 C 2559, 2008 U.S. Dist. LEXIS 22166 (N.D.Ill. March 20, 2008) (Class certification granted); *Matthews v. United Retail, Inc.,* 248 F.R.D. 210 (N.D.Ill. 2008) (FCRA class certification granted); *Redmon v. Uncle Julio's, Inc.,* 249 F.R.D. 290 (N.D.Ill. 2008) (FCRA class certification granted); *Harris v. Circuit City Stores, Inc.,* 2008 U.S. Dist. LEXIS 12596, 2008 WL 400862 (N.D. Ill. Feb. 7,2008) (FCRA class certification granted); aff'd upon objection (Mar. 28, 2008); *Harris v. Wal-Mart Stores, Inc.,* 2007 U.S. Dist. LEXIS 76012 (N.D. Ill. Oct. 10, 2007) (motion to dismiss in putative class action denied); *Barnes v. FleetBoston Fin. Corp.,* C.A. No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D.Mass. Aug. 22, 2006) (appeal bond required for potentially frivolous objection to large class action settlement, and resulting in a $12.5 million settlement for Massachusetts consumers); *Longo v. Law Offices of Gerald E. Moore & Assocs.,* P.C., 04 C 5759, 2006 U.S. Dist. LEXIS 19624 (N.D.Ill. March 30, 2006) (class certification granted); *Nichols v. Northland Groups, Inc.,* case nos. 05 C 2701, 05 C 5523, 06 C 43, 2006 U.S. Dist. LEXIS 15037 (N.D.Ill. March 31, 2006) (class certification granted for concurrent classes against same defendant for ongoing violations); *Lucas v. GC Services, L.P.,* case No. 2:03 cv 498, 226 F.R.D. 328 (N.D.Ind. 2004) (compelling discovery), 226 F.R.D. 337 (N.D.Ind. 2005) (granting class certification); *Murry v. America's Mortg. Banc, Inc.,* case nos. 03 C 5811, 03 C 6186, 2005 WL 1323364 (N.D. Ill. May 5, 2006) (Report and Recommendation granting class certification), aff'd, 2006 WL 1647531 (June 5, 2006); *Rawson v. Crediqy Receivables, Inc.,* case no. 05 C 6032, 2006 U.S. Dist. LEXIS 6450 (N.D. Ill. Feb. 16, 2006) (denying motion to dismiss in class case against debt collector for suing on time-barred debts).

I graduated from Colgate University in 1997 (B.A. International Relations), and from Loyola University Chicago School of Law in 2003 (J.D.). During law school I served as an extern to the Honorable Robert W. Gettleman of the District Court for the Northern District of Illinois and as a law clerk for the Honorable Nancy Jo Arnold, Chancery Division, Circuit Court of Cook County. I also served as an extern for the United States Attorney for the Northern District of Illinois and was a research assistant to adjunct professor Honorable Michael J. Howlett, Jr.

I was the Feature Articles Editor of the Loyola Consumer Law Review and Executive Editor of the International Law Forum. My published work includes International Harvesting on the Internet: A Consumer's Perspective on 2001 Proposed Legislation Restricting the Use of Cookies and Information Sharing, 14 Loy. Consumer L. Rev. 125 (2002).

I became licensed to practice law in the State of Illinois in 2003, and am a member of the bar of the United States Court of Appeals for the Seventh and First Circuits, as well as the Northern District of Illinois, Central District of Illinois, Southern District of Illinois, Eastern

District of Wisconsin, Northern District of Indiana and Southern District of Indiana. In 2009-10, I was the Vice-Chair for the Chicago Bar Association consumer protection committee, and I am currently the Chair for the committee. I am also a member of the Illinois State Bar Association, the Seventh Circuit Bar Association and the American Bar Association, as well as the National Association of Consumer Advocates.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Chicago, Illinois
December 17, 2010

Alexander H. Burke